PEDRICK v. RAILROAD.

(Filed December 22, 1906).

*Navigable Waters—Obstruction—Bridges—Public Nuisance —Right to Sue—Injunctions—Railroads—Charters—Construction — Crossing Rivers — Drawbridges — Control— State and Federal Government—Navigation—Evidence.*

1. The obstruction or interference with navigation being a public nuisance, no private citizen may sue therefor, unless he suffers some damage which is not common to the public.

2. A citizen who alleges that he owns and operates a sawmill on the banks of a navigable river and procures logs to be sawed in his mill in rafts, coming down the river both above and below a proposed bridge, etc., and is, in that sense, an abutting owner, is entitled to maintain an action to enjoin the construction and maintenance of a railroad drawbridge across said river below his mill as an alleged public nuisance, but a citizen who owns and runs sail-boats on said river has no right to sue.

3. The courts in such cases will act with great caution in interfering at the suit of private citizens. The State is the proper party to complain of wrong done to its citizens by a public nuisance.

4. The control of its navigable waters is with the State, the authority of the General Government being only cumulative protection from an interference with commerce.

5. The Legislature has the power to authorize a railroad corporation to cross and, of course, to erect a bridge over a navigable stream.

6. In ascertaining whether the charter of a railroad authorizes the construction of a bridge over a navigable stream, being in derogation of a public right, the rule of strict construction will be invoked and the power will not be found unless expressly given.

7. The charter of a railroad authorized it to construct a road from Raleigh, in an easterly direction, to or near Greenville; thence on the south side of Tar River to some point "above or near the town of Washington," which was on the north side of the river: *Held*, that the railroad was authorized to cross the river on a bridge, not necessarily "above" the town of Washington.

8. The power to control the management of a drawbridge over a navigable river after its construction, by requiring the draw to be kept open at all proper times, the removal of rafts or débris and in all other respects, in which the public welfare, interest and safety is involved, is ample in both Federal and State governments.

9. A drawbridge over a navigable water, although it unavoidably occasions some delay in passing it, is not necessarily such an obstruction to the navigation as to amount to a nuisance. To constitute nuisance, the obstruction must *materially* interrupt general navigation.

10. Where a railroad had authority by charter to construct a drawbridge over a navigable river, and the evidence was conflicting as to whether the proposed bridge would constitute a nuisance by reason of its location below a certain town instead of above said town, and it appears that about one-fourth of the work had been done before any application was made for an injunction, a judgment of the lower Court denying a temporary injunction restraining the construction of the bridge will be affirmed.

ACTION by Leroy Pedrick and others against Raleigh and Pamlico Sound Railroad Company, pending in the Superior Court of BEAUFORT, and heard by *Judge T. A. McNeill* at Washington, N. C., on 25 October, 1906.

This action is brought by the plaintiffs, citizens of the town of Washington, for the purpose of enjoining defend-

ant corporation from constructing and maintaining a bridge across the Pamlico River, a navigable waterway, wholly within this State, at the said town, for that "said bridge will materially burden, impede and obstruct navigation over said river and will constitute a public nuisance by rendering it difficult to pass said bridge with sailing vessels and floating rafts, barges, and other crafts, which are constantly plying the waters of said stream in their commerce with the said town and counties bordering on the waters of Pamlico Sound." The plaintiff S. R. Fowle alleges that "he is the owner of a large sawmill situated on said river above the proposed bridge, and is engaged in the manufacture of lumber, and is compelled, in the prosecution of his business, to float his logs to his said mill on the waters of said river in rafts and to ship lumber from his said mill in barges. Plaintiffs Pedrick and Rose are the owners of sailing vessels and engaged in the occupation of running the same between the docks of the said town and parts of the said river below the proposed bridge and the counties bordering on Pamlico Sound. Plaintiffs allege that sail-boat navigation will be peculiarly obstructed by said bridge, because of the effect of adverse winds, in the presence of which sailing vessels are compelled to tack and take different courses, which cannot be done in the space of seventy feet, the width of the draw in said bridge. They further allege that barges and floating rafts will be practically impossible of navigation because of the manner in which they are drawn by tugs, using ropes of such length that they cannot be controlled, but are subject to be dashed against the bridge by side-winds, etc. They further allege that the charter of defendant corporation does not authorize the construction of said bridge at the proposed point. That the construction of said bridge above the docks of the town would fully accomplish the purpose of

defendant's charter and but slightly affect the navigation above the town. They further allege that the charter only authorizes defendant to construct a bridge across Tar River, the mouth of which is at a point about three miles above the town of Washington.

The defendant admits that it has begun the construction and proposes to complete a railroad bridge across the river near Washington, at a point where said river is about one-half mile wide and at which there is but one channel of eight feet in depth and one hundred feet in width. That the said bridge is being constructed under the authority of the Legislature of this State and by virtue of authority of the Secretary of War and the Engineering Department of the Government of the United States. That prior to granting such authority, the said Secretary of War investigated and passed upon all matters pertaining to or affecting the navigation of the said river by vessels of every character. That said bridge is being constructed under the rules and regulations specified by the Secretary of War, and will be, when completed, with the draw across the channel of said river, in all respects a modern structure of the most approved construction, and will not interfere with, obstruct or retard navigation by vessels of the character navigating said river. A map showing the channel, piers and construction at the channel, is attached to the answer.

Defendant further avers that the aforesaid railroad running from the city of Raleigh to the town of Washington was not practicable of construction in any other place or in any other manner than that in which it has been laid out, located and is being constructed and that there was no other practicable way of entrance and crossing of the aforesaid river than that which has been adopted by the board of directors, authorized by the Legislature and approved by the Secretary of War, in

the place and at the point where it now proposes to construct the aforesaid bridge. That it is admitted that the plaintiff S. R. Fowle is the owner of a sawmill situated on said river, but this defendant avers that his aforesaid sawmill is only one of many mills located above said bridge, and the construction of this bridge will not and has not in any manner affected the aforesaid plaintiff S. R. Fowle in any other way or manner than the general public using said river for navigation; and it is further averred that no sailing vessel can now utilize said channel under adverse winds without the aid of a steam or power craft, and they aver that when their proposed bridge is completed that, instead of a channel 100 feet in width and 8 feet in depth, there will be two channels ·70 feet in width each, dredged to a depth of 9 feet for the use of such vessels, and it is denied that the construction of the aforesaid bridge will inconvenience, obstruct, or hinder navigation on said river by any manner of craft, and it is further denied that the plaintiffs or either of them have any peculiar or especial property or interest in the navigation of said river, or would be affected by the construction of said bridge to any greater extent than the general public by reason of the construction thereof, and that either of them would suffer any special irreparable damage thereby.

That in 1903 the Legislature of the State of North Carolina granted to this defendant power to locate, construct and operate a railroad for the transportation of passengers, freight, mail and express, from Raleigh in Wake County; thence in an easterly direction through Wilson County, running near the town of Wilson; thence through Pitt County, running to or near the town of Greenville; thence on the south side of Tar River to some point on or near, across said river in Pitt or Beaufort counties above or near the town of Washington; thence to or near the town of Washington or to some point in an easterly direction to tidewater ·in

the eastern section of North Carolina, on or near the Pamlico
River or Sound, as shall be determined by the said board of
directors.    That pursuant to the power in said charter
granted, the defendant company proceeded to lay out, locate
its line of railroad as in its charter authorized to do, and at
said time located and determined upon the crossing of the
aforesaid river at the point at which it now proposes to con-
struct its said bridge; that thereafter, to-wit, after its afore-
said line has been run and located, and after its board of
directors has determined upon a crossing of said river at
the point designated, the Legislature of North Carolina fur-
ther extended the rights, powers and privileges of the defend-
ant company by Private Laws of North Carolina, Acts of
1905, ch. 5, ratified 2 February, 1905, to construct said road
from the town of Greenville, thence in an easterly direction
through Pitt County to or near some point on the south side
of Tar River in Pitt or Beaufort counties; thence to or near
the town of Washington or to some point in an easterly direc-
tion to tidewater in the eastern section of North Carolina, on
or near the Pamlico River or Sound, as shall be determined
by the board of directors.    That undertaking to locate its
aforesaid line of railroad, this defendant has made careful
examination and has made accurate surveys, and to this end
has expended a large amount of money in its attempt to
locate its railroad, and that there is no other point at which
the crossing of said river can be established consistent with
the powers and rights and privileges granted by the aforesaid
Legislature; and this defendant avers that the right to build
the aforesaid bridge at the point at which it proposes to build
the same and the adoption by its board of directors of this
point of crossing the aforesaid river, was in strict compliance
and in accordance with the granted power and authority
of the Legislature of the State of North Carolina and the
general law of said State.    That pursuant to the granted

authority and power of the Legislature and the authority of
the Secretary of War so obtained, this defendant began and
is actively engaged in the construction of a railroad about
140 miles in length, and to this end has expended many hun-
dred thousands of dollars, and is now expending many thou-
sands of dollars each day for the completion of its aforesaid
railroad.    That it has fully constructed about twenty-five
miles of railroad, and will have completed the construction
of about forty miles more of railroad by 15 January, 1907,
and is in the process of constructing the entire line of its
railroad.    That in its work aforesaid, in the process of com-
pletion, this defendant company has been and is acting in
good faith, upon the assumption and belief and advice that
its aforesaid charter authorized and empowered it to cross the
river at Washington as it is proposing to do, and if it were
now stopped in the construction of said bridge it would entail
a loss upon this defendant company of many thousands of
dollars, and each day's delay it may be forced to suffer to
gratify the plaintiff and others would be an inestimable dam-
age, and would seriously affect this defendant in carrying out
its purposes and plans regarding the development of the east-
ern section of North Carolina and the completion of its line
of railroad for the use and convenience and advantage of all
the people of Eastern Carolina.

The defendant further averred that it was amply solvent
and able to respond in damages for any injury which plain-
tiffs might sustain by reason of the construction of said
bridge, etc.

The complaint is verified by plaintiff S. R. Fowle, and
the answer by C. O. Haines, president.

Summons was issued 24 September, 1906.    Pursuant to
notice, a motion for an injunction to enjoin the construction
of said bridge was heard before *McNeill, Judge,* 15 October,
1906.    Both parties filed a number of affidavits tending to

support their several contentions. Motion for injunction was denied, and plaintiffs appealed.

, *Shepherd & Shepherd* for the plaintiffs.

*L. I. Moore, Stephen C. Bragaw* and *Aycock & Daniels* for the defendant.

CONNOR, J., after stating the case: This appeal was argued before us with marked ability and learning, counsel citing authority for the support of their several positions. His Honor did not find the facts upon which he based his judgment refusing the injunction.

It will be convenient, in the discussion of the question presented, to state the uncontroverted facts material to the decision. The town of Washington, conceded to be a prosperous commercial community, containing about 8,000 inhabitants, is located on the north side, we will assume, of Pamlico River, about thirty-six miles above its mouth and (for this purpose) about three miles below the conjunction of said river with Tar River. The said river from its mouth to and above said town is navigable. That considerable traffic has been and is now carried on by the people of said town, over said river, with people living above and below Beaufort and adjoining counties. That said traffic is carried on by means of sailing, steam and gas vessels of considerable tonnage; that said river flows by and past the entire length of said town; there are a large number of wharves, stores, warehouses, together with several sawmills to which logs are brought in rafts from above and below said town, and the lumber is carried to market on barges towed by tugs down said river. That these mills and wharves are located both above and below the county (or highway) bridge which crosses said river, abutting on one of the streets of said town, the larger number of said mills and wharves being below said county bridge. The county bridge has a draw of thirty-six feet.

The defendant's resident engineer makes an affidavit to which is attached a map showing the formation of the banks of the river, width of the channel, location of bridge, distance, etc. We find no contradiction, in any material respect, of the statement made in this affidavit. After stating his opportunities for knowing the facts to which he testifies, he says:

"That from a point below the draw of the said bridge, a distance of 2,500 feet, the channel runs a practically straight course, about northwest by north coming up, and southeast by south going down. That the channel continues then in a straight line above the said draw for a distance of 1,300 feet. That any vessel coming up the said river has a direct approach to the said draw of 2,500 feet, and any vessel going down the said river has a direct approach to the said draw for a distance of 1,300 feet. That a direct approach to the draw in the county bridge, which crosses the said river from Bridge Street in said town, going up the said river, is about 450 feet; and that coming down the said river a direct approach can be made to the said county bridge draw for a distance of about 950 feet. That above the town of Washington the channel becomes more winding and crooked, and there is no point on the river between the town of Washington and the point three and one-half miles up the said river where the channel continues a straight course for a longer distance than 2,400 feet. That affiant has had opportunities of experience and observation in the matter of the construction of bridges across navigable waters, and knows that the bridge now being built by the said company is modern in character and of approved design, and that the draw of the said bridge is of a character recognized by the experts as being safe, convenient and readily opened and closed, and such as is in common use in railroad bridges at this time. That from Willow Point above, the course of the river is very winding, with sharp turns and short stretches of water, and the location of a bridge

across the stream above Willow Point would, of necessity, more seriously interfere with the navigation of said river above Willow Point than can the bridge located as is now proposed be to navigation upon the river from Washington to points below. That during the month of September pilings were driven at the points at which will be placed the center pier and end piers of the draw of the said railroad bridge. That from the time of the driving of these pilings until this date there has been left open and clear for the passage of water craft something more than half of the total space that will be provided for the passage of such craft after the said draw is completed. That during this time, that is to say, from the early part of September, affiant has been daily either on the said river or on the shore thereof opposite the proposed draw, and has seen every day numbers of sailing vessels, steamers, gas-boats, tugs and barges, and tugs with rafts of logs in tow, pass through said space without delay, inconvenience or difficulty. That affiant has at times seen a tug with two barges in tow, the said barges lashed together, pass through the said space, and has, at other times, seen the tug with two barges, one behind the other, pass through the said space without difficulty. That during the period of time referred to, the wind has been variable; unusually heavy tides have prevailed, and a considerable portion of the time the weather has been what is commonly called stormy. That the construction of the said bridge, in accordance with the plans, will not have the effect of causing the channel of the river, either at the draw of the bridge or above or below the same, to fill up, but, on the contrary, the tendency would be to avoid the result. The plan upon which said bridge is being constructed will leave a space in the channel of the said river not less than seventy feet wide, and another space of the same width, which will become a part of the channel. That the plan attached shows the general elevation of the draw-span of this railroad

bridge the depth of the water on each side of the center pier and between it and the two end piers. That upon the plan is indicated the relative location of the center and end piers, the space left open for the passage of water craft and the depth of the water at mean low-water level. That this plan has been made after a thorough sounding and examination of the said river and the bottom thereof, and is correct. That the depth of the water between the center pier and the end pier, to the south, runs from ten feet on the southern edge to twelve feet next the center pier. That the depth of the water between the center pier and the north pier runs from twelve feet and six inches to thirteen feet; and this depth is practically maintained in the channel for a distance of about two hundred feet below the draw and for the same distance above."

The defendant's charter, Private Laws 1903, ch. 1, authorizes the company to construct a railroad from Raleigh in Wake County in an easterly direction * * * to or near the town of Greenville; thence on the south side of Tar River to some point on, near, across river in Pitt or Beaufort counties, above or near the town of Washington; thence to or near the town of Washington * * * as shall be determined by said board of directors." The charter was amended by the General Assembly, Private Laws 1905, ch. 5, permitting the road to be carried to Snow Hill, in Greene County; thence to Greenville; thence "to or near some point on the south side of Tar River in Pitt or Beaufort counties," etc.

Defendant alleges, and it is not denied, that prior to the amendment of its charter by the General Assembly of 1905, it "proceeded to lay out and locate its line of railroad, and determine upon crossing the said river at the point at which it now proposes to construct its bridge." That on the day the summons was issued in this action, the bridge was more than one-fourth completed. We omit any reference to the

affidavit showing the progress of the work and present condition of the bridge.

Before proceeding to discuss the question whether, and to what extent, the proposed bridge would impede, obstruct or interfere with navigation, we will dispose of the two preliminary questions raised by the pleadings and argued before us:

1. Are the plaintiffs or either of them entitled to sue, that is, have they alleged such special and peculiar damage, different in kind from the public generally, by reason of the construction and maintenance of the bridge, as under the settled principles of law give them a right to sue?

2. Does the charter of defendant road authorize it to construct a bridge over Pamlico River at any point, or is it restricted to the construction over Tar River?

The obstruction or interference with the navigation being a public nuisance, it is elementary learning that no private citizen may sue therefor, unless he suffers some damage which is not common to the public, or, to express it affirmatively, he may sue by showing that he sustained some special peculiar injury, different in kind from the public. *Manufacturing Co. v. Railroad,* 117 N. C., 579, where the authorities are cited in a well-considered opinion by *Mr. Justice Avery.* The question is discussed and the latest authorities cited in Joyce on Nuisances, 267-271. We have no difficulty in finding that none of the plaintiffs who sue, in respect to their citizenship of the town of Washington, are entitled to do so upon the averment in the complaint. Mr. Fowle avers that he is the owner of a sawmill on said river, located above the proposed bridge, and that he procures the logs to be sawed at his mill in rafts coming over said river, both from above and below the proposed bridge; that he ships his lumber to market over said river in barges which must be towed by tug-boats down the river and through the draw in the bridge.

Plaintiffs Pedrick and Jones say that they own and run sail-boats on said river passing from the docks above the proposed bridge into Pamlico Sound, etc.

It is not clear, upon the authorities, whether the allegations bring these plaintiffs within the principle entitling a private citizen to sue in such cases. If we look beyond our own decisions, we find much conflict in the cases applying the rule. We incline to the opinion, without undertaking to discuss and reconcile them, that upon the allegations in the complaint, plaintiff Fowle is, upon the authority of *Manufacturing Co. v. Railroad, supra,* entitled to maintain the action. *Baird v. Shore Line Railroad Company,* 6 Blatchf. (C. C.), 276; *Hickok v. Hine,* 23 Ohio St., 523; Wood on Nuisances, 853.

The right of plaintiffs Pedrick and Jones is much more doubtful. We do not very clearly perceive how their right to use the right of navigation for the purpose of having their boats to pass up and down the river differs, in kind, from that of all other persons. Mr. Wood says: "It is not enough that he has sustained more damage than another; it must be of a different character, special and apart from that which the public, in general, sustains, and not such as is common to every person who exercises the right that is injured." Nuisances, 646. In *Clark v. C. & N. Railroad Co.,* 70 Wis., 593, *Lyon, J.,* says: "The complaint herein alleges that the plaintiff owns a steam yacht, upon which he desires to travel daily and carry passengers between Neenah and Appleton; that in his business of a manufacturer he is largely interested in transporting freight up and down the Fox River, past the point where defendant's bridge is located, and would transport such freight by river but for the bridge; but now boats, passengers and freight have to take a circuitous route by reason of the bridge. The complaint fails to state where the plaintiff's business is carried on, or that he owns any

143—32

property affected by the alleged nuisance; or that he has ever made any attempt to pass the bridge or that he has any riparian rights affected by it. The whole substance of the complaint is that he desires to navigate the Fox River, where the bridge stands, with his yacht, and to transport passengers up and down the river at that point, but cannot do so because of the bridge, and is compelled to take a longer route to reach desired points. If there is any element of special damage alleged in the complaint—damage not suffered by the whole public, who navigate or may desire to navigate Fox River between the same points—we fail to discover it." *Manson v. Railroad,* 64 S. C., 120; *Swanson v. M. & R. Boone Co.,* 42 Minn., 532.

We are of the opinion that the plaintiffs, other than Mr. Fowle, fail to show any right to sue. It is not very clear that he has such right, but, as he alleges that he owns and operates a mill on the banks of the river and is, in that sense, an abutting owner, we think, and, for the purpose of passing upon the other questions, hold that the action will lie.

It is held by some courts, and with reason, that a court of equity will entertain a bill to enjoin a proposed public nuisance by one who might not be able to maintain an action at law. "The strictness of the original rule has been greatly modified since the days of Lord Coke," Joyce on Nuisances, sec. 424; *Wiley v. Elwood,* 134 Ill., 281 (28 Am. Rep., 673; 9 L. R. A., 726). In such cases the reason upon which the principle is founded, to avoid a multiplicity of suits, does not apply. It is uniformly held, however, that the courts in such cases will act with great caution in interfering at the suit of private citizens. The State is the proper party to complain of wrong done to its citizens by a public nuisance.

In regard to the second question, it will be well to state, as the basis of this discussion, a few elementary principles, before proceeding to consider the peculiar language of the

charter. The power to regulate the use of navigable waters in the State, subject to the power in the National Government, is in the General Assembly. The law is thus stated by *Battle, J.,* in *State v. Dibble,* 49 N. C., 108: "The Neuse River having been thus recognized as a navigable water, the defendants had the right, in common with all other citizens, to navigate it with their boats and, as an incident of such right, to remove all obstructions not put there by or under the sovereign power. It is admitted that the sovereign power in this case is the General Assembly of the State." It is clearly within the power of the Legislature to authorize a railroad corporation to cross and, of course, erect a bridge over a navigable stream; both constitute, in this sense, a part of the system of public highways of the State. These propositions are not denied by the learned counsel for plaintiffs.

It is suggested that, by a proper construction of the charter, the defendant is restricted to the construction of a bridge across the Tar River, and that the eastern terminus of this river is at Willow Point, about three miles above the town of Washington. Defendant suggests that the point is not the terminus of Tar River, but that it continues, by that name, until it reaches and passes the town of Washington. It is conceded that the eastern terminus of the river is not fixed by any legislation. We do not deem it at all decisive of the right of defendant to cross the river "near" Washington to fix the exact terminus. It is evident from the language of the records and affidavits that, whatever may have been the understanding in the past, the town of Washington is now understood to be located on the Pamlico River. We note that the charter of the Washington Toll Bridge Company, granted 24 December, 1812, empowers the company "to build a bridge across Tar River, above the town of Washington, in Beaufort County, and near the said town, to commence at Bridge Street." *Washington Toll Bridge Co. v. Commissioners,* 81

N. C., 461. It also appears from the record set out in that
case that subsequent legislation referred to it as Pamlico
River. The Century Dictionary refers to Tar River as "flow-
ing into Pamlico Sound. It is called in its lower course,
Pamlico River." In "North Carolina and its Resources," a
work published by authority of the State Board of Agricul-
ture (1896), p. 122, it is said of Tar River: "At Washing-
ton it expands into a broad estuary, navigable for sea-going
vessels, and thence takes the name of Pamlico River." We
note these descriptions of the river, not as showing that Wash-
ington is, as a matter of law or fact, on the Tar River, but as
indicating that the exact terminus is not known, and that in
construing the charter this fact should be kept in view.

It is well known that in our State other rivers have been
called by more than one name in different localities. The
purpose of the Legislature was to authorize the defendant to
construct a road from Raleigh to Greenville, thence on the
south side of Tar River to Washington, which is on the
north side of the river, the exact status of which, in respect
to its name, is not ascertained. No one doubts that the road
was to cross "the river in Pitt or Beaufort counties above, or
near, the town of Washington, as shall be determined by the
board of directors." These facts are thus settled: it was to
cross the river from the south to the north side, to some point
"above or near the town of Washington." It is not seriously
contended that the road *must* cross at Willow Point, or that
to cross at such point is either desirable or practicable.

We fully concur with the position of the learned counsel
for plaintiff in regard to the rule by which grants of power to
corporations are to be construed. The authorities cited
sustain them. "All public grants are strictly construed;
nothing can be taken against the State by presumption or
inference." *Delaware Railroad Tax,* 18 Wall., 206; *State v.
Freeport,* 43 Me., 202. In ascertaining whether the charter

of a railroad authorizes the construction of a bridge over a navigable stream, being in derogation of a public right, the rule of strict construction would be invoked, and the power would not be found unless expressly given. The construction of somewhat similar language was before the Supreme Court of Massachusetts, in *Fall River Iron Works Co. v. Railroad,* 87 Mass., 221, where *Bigelow, C. J.,* said:

"We cannot doubt that where an unrestricted grant of power is made to a corporation to construct a road between two points, it carries with it the right to cross navigable waters, if they interfere in a course or route which is otherwise reasonable and practicable, and if the road can be constructed without destruction of the public easement or seriously impairing its convenient enjoyment and use."

The power to cross the river is given by necessary implication. It would be to attribute to the Legislature either ignorance of the geography of the State or a purpose to trifle with an important subject to say that it did not know that to leave Greenville at a point on the south side of Tar River and go to Washington did not necessarily involve crossing some river "above or near Washington."

Having reached the conclusion that the defendant has, by its charter, the right to cross, that is, construct a suitable bridge over the river, the question arises, whether it is restricted to such crossing *above* Washington. To adopt this construction would be to eliminate the word "near." If the Legislature intended to fix the point of crossing definitely "above" Washington, it was unnecessary to use the word *"near."* As said by the Supreme Court of Massachusetts: "The first and most obvious suggestion is, that the Legislature did not intend to fix with absolute certainty and precision the point of departure for the new road, which the defendants were authorized to build. In using language which was so vague and indefinite as to leave open for future determina-

tion the location of this point, it is clear that, owing to the nature of the ground, or for some other sufficient reason, it was not deemed expedient or necessary to fix it with accuracy. It is also clear that in thus omitting to designate it, it was their intention to delegate the power of locating it definitely to the defendants or their agents, and to vest in them the exercise of the needful judgment and discretion to carry into effect the authority which they intended to grant." Farnham on Waters, 327 (a). Thus, we find in the defendant's charter, power given the board of directors to determine the point of crossing the river—of course, to be exercised within the limits of the grant—"above, near" the town of Washington. This is the usual form in which the termini of proposed railroads are fixed. It is necessarily so, because we know from observation that the exact termini of railroads are never fixed until after the charter is granted; hence, words similar to those found here are generally used, followed by the power to the directors to fix them by survey or otherwise. *Justice Bigelow,* in the case cited, says: "It follows, that unless the defendants have clearly exceeded the limits of this discretion, and have acted either in bad faith or in disregard of the just limits which by a reasonable construction of the words of the statute should be put on their power to fix the *terminus a quo,* they cannot be deemed to have invaded the plaintiffs' rights, or be held amenable to process, restraining them from prosecuting their work and constructing their road, according to the plan * * * They are authorized to commence at a given point, or near it. If they embrace the latter alternative, a wide range is necessarily left open to them. The word "near," as applied to space, can have no positive or precise meaning. It is a relative term, depending, for its signification, on the subject-matter in relation to which it is used and the circumstances under which it becomes necessary to apply it to surrounding objects." Wood Nuisances, sec. 274.

We think this correctly states the rules of construction, and, applying it to this case, we are of the opinion that it was within the limits of the power conferred upon the directors of the defendant, acting in good faith, and a due regard to the rights of the public, to locate the bridge below the town of Washington. ·

We are thus brought to a consideration of the question whether the location, in the light of the evidence before us and for the purpose of disposing of this appeal, is reasonably necessary to the accomplishment of the purpose for which the power is granted, and whether, in the light of such evidence, we can say that it is reasonably practicable to locate the bridge above the county bridge. We concur with the plaintiff in saying that if the location of the bridge below the town will create a nuisance, and if defendant reasonably can accomplish the same purpose by placing it above the town, the charter will be so interpreted as to confine it to such location. 16 A. and E. Enc., 1001 (1 Ed.).

In *Hickok v. Hines*, 23 Ohio St., 523, it is said: "Corporations or public officers are not authorized to obstruct the navigation of a river under a legislative grant of power, merely for the building of a bridge across the river, when the bridge can reasonably be constructed so as not to destroy the navigability of the river." In that case the Court found that the effect of the proposed bridge "would effectually destroy all navigation and practically destroy the navigability of the river above the bridge." The right to build a bridge was not denied, but the contest related to the *kind* of bridge that· might lawfully be constructed. An injunction was sought only against the building of a bridge *"without a draw."* *Tilman v. Wolfe*, 27 Texas, 68, was an action for damages for obstructing a navigable stream. The jury found that the obstruction was a nuisance, and the Court held that the statute

under which plaintiffs in error constructed the bridge did not authorize them to do so.

We have held at this term, in *Thomason v. Railroad,* that power conferred upon a railroad company to construct and operate a railroad must be exercised with a due regard to the rights of the public and of the owners of property abutting or near to the road. In *Met. Asylum Dist. v. Hill,* 6 L. R. (1880-81), 193, the jury, upon an issue submitted, found that the erection of the hospital for the reception of smallpox patients would be a nuisance, endangering the health of the persons living near-by. It was ruled by the House of Lords that the language of the statute did not authorize the establishment and maintenance of the nuisance.

The power being in the Legislature to authorize the obstruction of a navigable stream by the erection of another highway, as a county bridge or a railroad bridge, the courts will not undertake to control the exercise of the power. The question whether the proposed bridge, if an obstruction, is necessary for the public convenience, is for the Legislature, but in interpreting statutes, by which it is claimed the power is conferred, the courts will apply the rule of strict construction and interpret them upon the theory that the Legislature did not intend to confer power to unreasonably or unnecessarily obstruct the highway or navigation. Farnham on Waters, sec. 1296.

For the purpose of deciding the controverted questions of fact, necessary to dispose of the motion for an injunction, in no manner affecting the rights of either the State or such persons as may be entitled to sue, to have these questions in some appropriate action decided by a jury, we are confined to the complaint and answer, together with the affidavits and exhibits filed. It is not seriously contended that the proposed bridge will obstruct, that is, altogether prevent, boats, barges or rafts passing up and down the river, or that in the

mode of its construction, in respect to the draw and the caisson, upon which it rests, the most approved methods have not been adopted. The objection is directed to the *location* of the bridge, and not to its kind or construction. It is alleged, and not contradicted, that it is being constructed in accordance with the plans and specifications of the War Department and its engineers. The power to compel the management of the bridge after its construction, by requiring the draw to be kept open at all proper times, the removal of rafts or débris, the dredging of the channel, if found to fill up by reason of the caissons, and in all other respects in which the public welfare, interest and safety is involved, is ample in both Federal and State governments. We are, therefore, to eliminate all other questions and consider the testimony only in regard to the location. We find, upon an examination of the authorities, a recognition of the principle that where two rights exist, public as well as private, they must be used and enjoyed in the light of the maxim *"Sic utere,"* etc. *People v. Railroad Co.,* 15 Wend., 134. The rule laid down by Mr. Farnham, and which we think correct, is: "As commerce upon land has increased and become more important, its requirements have modified to some extent the old rule which prevented any interference whatever with navigation rights, *and each right modifies the other;* so that the obstruction to the navigation will not be regarded as unreasonable and a nuisance, unless it is material and unnecessary in view of the requirements of the land traffic." 2 Waters, 1290. He further says: "If a bridge is necessary for the convenience of the public, and does not prevent the free use of the stream as a public highway, although causing some slight inconvenience to those who had been in the habit of navigating the stream by obliging them to take some additional precautions in passing it, it is not necessarily a nuisance. The fact that the channel is somewhat abridged, or that vessels are delayed

to a slight degree, does not render the bridge a nuisance."
*Mr. Justice McLean* in *Works v. Junction Railroad,* Fed.
Cases, No. 18046, says: "A draw-bridge over navigable
water, although it unavoidably occasions some delay in pass-
ing it, is not necessarily such an obstruction to the navigation
as to amount to a nuisance. The delay is submitted to in
consideration of the benefits conferred." The discussion of
the Judge in this case is enlightening and apposite to the one
before us. "To constitute nuisance, the obstruction must
*materially* interrupt general navigation." *State v. Wilson,*
42 Me., 9; *Woodman v. Pittman,* 79 Me., 456. In *Attorney-
General v. Del. & B. Railroad Co.,* 27 N. J. Eq., 1 (page 27),
it is said: "The rule of law is that where a bridge over a
navigable stream is erected for public purposes, and produces
a public benefit, and leaves reasonable space for the passage
of vessels, it is not indictable; and another rule is, that
the bridge must appear plainly to be a nuisance before it can
be so decreed, since a court of equity proceeding by bill, like
a criminal court trying an indictment, must give the defend-
ant the benefit of all reasonable doubts." *Williams v.
Beardsly,* 2 Carter (Ind.), 591.

We have examined with care the affidavits filed in the case.
Eliminating the complaint and answer, we find an irrecon-
cilable conflict of *opinion* in the affidavits, while there is but
little of fact. Seventeen persons who either own or operate
sail, steam, or gas vessels and boats on said river, express the
opinion that the proposed bridge will seriously impede,
impair and obstruct navigation. Twenty-one persons who say
that they are in the same position to form opinion, are equally
explicit and positive in expressing the opinion that the pro-
posed bridge will not materially burden, impede or obstruct
navigation upon the said river, nor will it seriously interfere
with or tend to diminish or discourage commerce upon the
said river. Each of the affiants gives the reasons upon which

their opinions are formed. It is impracticable for us to discuss them in detail; we are not sufficiently familiar with the questions involved to do so intelligently. We take, merely as illustrating the divergence of opinion, the affidavit of Mr. Bell, who says that he is sixty-two years of age and has been for many years engaged in navigating the river. His opportunity is evidently good for forming an opinion. He says that the bridge will seriously obstruct navigation, giving his reasons therefor. Captain Springer, on the other hand, says that for twenty-five years he has navigated the river. He says that in his opinion no such result will follow. Both appear, from their affidavits, to be intelligent, honest men. They are a fair sample of the other affiants. A large number of citizens engaged in all kinds of occupations and professions express divergent opinions. If we were controlled in our judgment by numbers, the defendant would have the advantage.

Recurring to the parties to the action, we note that the complaint used as an affidavit is not verified by Mr. Pedrick or Mr. Jones. The affidavit of Mr. Haines is very full and explicit; he has large opportunities for knowing the conditions, and his opinions are entitled to much weight. Mr. Packard, an intelligent and evidently well-informed man and resident engineer of defendant, says that he has unusual opportunities for observing the character and class of commerce carried on upon the river. That he has made careful sounding examinations and surveys for the purpose of ascertaining the depth, width, character and course of the channel for a distance both above and below the town of Washington. He gives the result of his work as stated herein. He says that during the month of September pilings were driven at the points at which the center pier and end piers of the draw will be located. That from the time of the driving of the pilings to that of making the affidavit there has been left open some-

thing more than half of the total space that will be provided
for the passage of boats when the bridge is completed; that
during this time he has been daily either on the river or the
shore opposite the proposed draw, and has seen every day
numbers of sailing vessels, steamers, gas boats, tugs and
barges and tugs with rafts of logs pass through said space
without delay, hindrance or difficulty. That during said
time the wind has been variable, usually heavy tides have pre-
vailed, and for a considerable portion of the time the weather
has been what is commonly called stormy. Captain Mohan
says that he is engaged in navigating the river, transporting
lumber and general freight to and from Washington and
Philadelphia and other northern points. That his "barge is
a vessel of 432 tons, 183 feet and 7 inches on keel and about
190 feet and 10 inches beam and about 12 feet deep," and one
of the largest which "comes into these waters." That barges
can be navigated through the draw in the proposed bridge
without difficulty, and that the bridge will not impede, burden
or obstruct navigation. He gives the width of draws and
manner of construction of bridges over a number of navigable
rivers between Washington and Philadelphia, showing that
the draw in the bridge in controversy corresponds with many
others. He says: "Affiant does not know of any draw-bridge
across any river in North Carolina that is more easy of access
and less difficult to pass through, or that constitutes less of an
obstruction to navigation than will the draw-bridge now being
constructed by defendant."

In the light of this conflict of opinion and in view of the
fact that courts of equity are cautious in interfering with a
public improvement upon an allegation of apprehended in-
jury, we would hesitate to enjoin the further construction
of this bridge. *Judge McLean* in *Works v. Junction Co.*,
*supra,* a controversy much like this, says that where the evi-

dence is equally balanced "the preventive and extraordinary remedy invoked ought not to be given."

Several witnesses express the opinion that it would be practicable for defendant to locate its bridge above the county bridge. The testimony in this respect is conflicting.

In *Barnes v. Calhoun,* 37 N. C., 199, plaintiff sought to enjoin the construction of a mill for that it would create a public nuisance, sobbing lands and injuring the health of the people. The testimony was conflicting. *Judge Gaston* said: "Upon the whole, we confess that the strong leaning of our opinion is with those who think that the apprehensions of the plaintiff are not without foundation. But we do not, on that account, feel ourselves authorized to grant the extraordinary remedy which he asks of us. We entertain no doubt of the right of this Court thus to act in cases of undoubted and irreparable mischief, and we hold that it may thus act upon the application of individuals, not only in the case of a private nuisance, but where the individuals suffer special injury, in the case of a public nuisance also. *Spencer v. London and Birmingham Railroad Co.,* 8 Simons, 193. But it will only act in a case of necessity, where the evil sought to be prevented is not merely probable, but undoubted. And it will be particularly cautious thus to interfere, where the apprehended mischief is to follow from such establishments and erections as have a tendency to promote the public convenience." He emphasized the right of the plaintiff to sue at law for damages, and, if necessary, upon a verdict establishing the nuisance, apply for equitable relief.

In *Attorney-General v. Lea,* 38 N. C., 301, *Judge Nash,* citing *Attorney-General v. Blount,* 11 N. C., 384, says that the Court will enjoin a public nuisance *"in a plain case."* (Italics his). In this case an injunction to enjoin the erection of a public mill was dismissed. In *Simpson v. Justice,* 43 N. C., 115, plaintiff sought to enjoin a private nuisance. *Pearson,*

*J.,* says that the fact of nuisance must be established by an action at law or *"by strong and unanswerable proof."* (Italics his). The same principle controlled the Court in *Wilder v. Strickland,* 55 N. C., 389, *Nash, C. J.,* saying that if the erection of the mill should result in a nuisance, the courts of law would be open to the complainants. *Hyall v. Myers,* 73 N. C., 232; *Dorsey v. Allen,* 85 N. C., 358; *Reyburn v. Sawyer,* 135 N. C., 328. When we look into other jurisdictions we find the same rule uniformly adhered to. In *Eaton v. N. Y. & L. B. Railroad Co.,* 24 N. J. Eq., 49, which was a bill to enjoin the construction of a bridge over a navigable water, the Chancellor said: "The work which is sought to be enjoined is a public enterprise of much importance to the people of the State, who, through their Legislature, have authorized its construction. I find no evidence of bad faith on the part of defendant, nor even any imputation of it. This Court is always reluctant to stay the progress of such enterprises, and will only do so in a case clearly calling for its intervention." He further says that if the defendants have done any wrong or unauthorized act "they may be called to answer for it in a court of law. They receive no license or immunity by the refusal of this Court to interfere with them on this application."

There is another view of the case pressed upon our attention. It appears that the defendant made contracts for the construction of the bridge and expended large amounts of money in the preparation for its placing; that for several months it was at work thereon. That pilings were driven, the foundation of the structure made and, as one witness said, about one-fourth of the work done before any application was made for an injunction. It is said in reply to this that plaintiffs had made application to the Attorney-General to institute suit, and were awaiting action by him. While the delay in bringing the action is not controlling in our minds,

we cannot disregard the facts in the record. It is manifest that the question of the location of the bridge has been discussed by the citizens of Washington and the defendant for some time, and that there is a division of public opinion in regard to it. The reports of Captain Johnson of the engineer corps show this. The surveys were being made and many and most unmistakable steps were taken showing that defendant had selected the location for the construction of this bridge. The observations of the Chancellor in *Eaton v. N. Y. & L. B. Railroad, supra,* in this aspect of the case, are in point. It may be proper to say that we do not concur in the view pressed by defendant, that the decision of the Secretary of War permitting the location of the bridge is conclusive. The control of its navigable waters is with the State, the authority of the General Government being only cumulative protection from an interference with commerce. *Lake Shore & M. Railroad v. Ohio,* 165 U. S., 365.

Upon a careful review of the evidence and authorities, we concur with his Honor, and his judgment must be

Affirmed.

Brown, J., did not sit on the hearing of this case.