ZINA STANNARD *vs.* ALFRED HUBBARD AND OTHERS.

The statute (Gen. Statutes, tit. 23, sec. 2,) provides that "whoever shall first make a weir for catching fish on any flat within any river, cove or harbor, shall not be interrupted in the enjoyment of it by any other person, &c." This statute is an ancient one and was passed before modern fishing pounds were used. Held however that these pounds, being used for the same purpose as weirs and in substantially the same way, are to be regarded as weirs within the statute.

Held also that a flat, within the meaning of the statute, is a place covered with water too shallow for navigation with vessels ordinarily used for commercial purposes.

A place where the water near the shore was from four to six feet deep, and which extended into water eighteen feet deep, held not to be a flat.

BILL for an injunction against the use of a fishing pound by the respondents to the obstruction of that of the petitioner previously established, brought to the superior court in Middlesex county. The second section of the "act for encouraging and regulating fisheries," (Gen. Statutes, tit. 23,) provides that "whoever shall first make a weir for catching fish on any flat within any river, cove, creek or harbor, shall not be interrupted in the enjoyment of it by any other person making a weir on the same flat, or in the way or course of the fish coming to said weir first built, and nearer than three-quarters of a mile to said weir first built, unless such person shall have first obtained liberty from the superior court." The

petitioner claimed that the fishing pound of the respondents was made and used in violation of this act. The following facts were found by a committee.

The petitioner at the time of bringing his petition was in the possession of a valuable shad and white-fish fishery in the harbor of Westbrook, operated by means of stakes driven into the soil with seines or nets fastened thereto, with one or more enclosures into which the fish are led and retained until they are taken out by the fishermen. For the last twelve or fourteen years the fisheries in the harbor of Westbrook have been operated by means of these structures, generally called pounds, and claimed by the petitioner to be weirs within the meaning of the statute, and fishing with seines has for that length of time been discontinued. John Lewis owns Menunketeset Point, running out into the sound and forming the west side of Westbrook harbor. He claims to own the fisheries between the Point and the petitioner's pound, and he leased to the petitioner these fisheries for a short term which has not yet expired. Up to within the last fifteen or eighteen years there were also seine-fisheries along the edge of the flats, east of the Point and along the shore of the harbor of Westbrook, which runs eastwardly from the upper or northerly end of the Point, at nearly a right angle, to a point more than half a mile easterly of the petitioner's fish-works. The waters between these points and this line of shore constitute Westbrook harbor, and the ground near the shore line, though much of it is at all times covered with water, is for a considerable distance called flats; but where the flats end and the deep water commences was left too indefinite by the witnesses to be found. John Lewis and his grantors owned, and Lewis now owns, the exclusive right to draw seines upon the upland of Menunketeset Point, and the public in common had and now have the right to fish with seines along the flats by the line of shore. And it frequently happened when fishing with seines was practiced, that the waters near the upper end of the Point, and also near the westerly end of the line of shore, were for a considerable distance swept by seines which were worked both from the upland of the Point and from the flats

along the shore.  John Lewis and his grantors, and the peti-
tioner as his lessee, have had and have the exclusive right to
draw seines upon Menunketeset Point, but they have not had
and have not now the exclusive right to fish in the waters
easterly of the Point at the place where the fishing from the
shore or flats was over the same waters that were also fished
over by seines from the Point ; and whether John Lewis and
the petitioner have the exclusive right to fish in the waters
where the respondents erected their fish pound, depends upon
whether the fact that their grantors for a period of more than
fifteen years previous to the time when fishing with seines
was abandoned, exclusively fished in so much of the waters
as are within the distance of sixty rods from the line of the
shore at the Point.   It was found that they did so exclusively
fish along the shore of the Point wherever it was practicable
to fish with seines, and that the grantors of Lewis cleared the
fisheries along the Point from stones and other obstructions
and exclusively fished there ; but that it was not practicable
for others to fish there with seines, because they had no place,
within any reasonable distance, on which they could draw
their seines, and the water was too deep to fish with seines
without such a place.

The petitioner's pound is at a distance of more than one
hundred rods from Menunketeset Point, and at a place where
no one had any exclusive right to fish at the time it was first
erected.   The first pound erected in the harbor nearest the
Point was erected in 1851.   That structure was not upon
the same ground as the one which has since been in use, but
at least thirty rods west of the present structure.   A pound,
substantially like the one now in use, and upon substantially
the same ground, has been maintained for about twelve years.
It commences at a point about half a mile from the shore
north of it, at a place where the water is at ordinary low
water from four to six feet deep, and runs out into water that
is eighteen feet or more in depth.

The respondents, in May, 1865, erected a pound in the
water between Menunketeset Point and the petitioner's pound,
which commenced within about eighteen rods of the shore of

the Point, at a place where the grantors of John Lewis had been in the exclusive practice of fishing with seines, at the time when that was the usual mode of fishing, and extended out about sixty rods, and was less than three quarters of a mile from the petitioner's pound. The outer end of the pound was further out than it had ever been the practice to fish with seines, and all of it was outside the flats, (unless the facts found show otherwise,) in water more than eight feet deep at low tide. It was also so located between the petitioner's pound and the outer water of the sound as to obstruct, to some extent, the fish in coming to the petitioner's pound, and was therefore of some injury to the petitioner, but to what extent it was not possible to find from the evidence. The respondents' pound proved to be of little or no value, and in consequence thereof the maintenance of it was abandoned within a few weeks after the commencement of fishing with it, and the seines or nets which formed the only obstruction to the fish passing through it were removed, and in the course of the fishing season in which it was erected the stakes were also removed, and there has been no intention to replace any part of the pound since that time. The structures of the petitioner and the respondents were claimed by the respondents not to be "weirs" within the meaning of the statute. The committee found that they were used for and answered the same purpose of guiding fish into a trap or inclosure where they could easily be taken; and that, unless the fact that the material of which they are constructed renders the modern fish pounds a different thing, the structures in question were weirs within the meaning of the statute. The committee also found that the structures in question were both within Westbrook harbor, but not on any flat in the harbor, unless the term "flat" within the meaning of the statute includes all the territory within the harbor where the bottom is a substantial plain with but a slight inclination downwards towards the open sound or sea; that if such is the meaning of the word "flat" as used in the statute, the structures were upon the flat in the harbor, but if that is not its

meaning that they were in deep water as distinguished from a flat.

On these facts the case was reserved by the superior court for the advice of this court.

*Doolittle* and *L. E. Stanton*, for the petitioner.

*C. R. Ingersoll* and *Chadwick*, for the respondents.

HINMAN, C. J. Some questions have been argued before us in this case which, under the view we have taken of it, are unimportant to the decision, and will therefore be left undetermined and for the most part unnoticed.

The finding undoubtedly tends strongly to show that John Lewis had a free fishery to fish with seines on the easterly side of Menunketeset Point, at certain places where he and his grantors had been in the habit exclusively of fishing; and unless the law is so that a private right to a fishery in public waters cannot be acquired by the mere use and possession of it for fifteen years, because such fishing is but the exercise of a right which is common to the whole public, and therefore is not sufficient evidence of an adverse user, as seems to be the doctrine of the case of *Chalker* v. *Dickinson*, 1 Conn., 382, it does show such a fishing right in Mr. Lewis. But however this may be, it was not the object of the bill to protect the petitioner in the enjoyment of this fishery. He was not occupying it at the time, and, so far as we know, he had no intention to occupy it during the short period before his lease expired. However true, therefore, it may be that some portion of the respondents' line of stakes may have extended into ground which had been swept by the seines of the former occupants of this fishery, still, since the petitioner is not now occupying or intending to occupy this place as a fishery, he obviously cannot be so injured in respect to it as to give him any claim to protection by an injunction against an interference with any technical right which he may have; and especially since the relief sought for in the bill is not founded upon his right to this particular fishery, but wholly upon an injury to his fishing weir or pound, which appears by the

finding to be entirely outside of any fishing place connected with the shore, in water which is common to the whole public, unless, indeed, the petitioner has acquired some right thereto under the statute in relation to weirs, by virtue of his being the first to construct his weir there. If, then, the facts relating to this shore or seine fishery, and the injury to it to be apprehended from the respondents' works, was all there was in the case, it would hardly be claimed that an injunction should be granted. It is equally clear that the facts in relation to this fishery can have no bearing whatever upon the petitioner's right to be protected from interference in respect to his weir, upon which the principal question in the case arises. The petitioner's right to protection from interference in respect to his weir is founded wholly upon the statute. His weir is in the public water, below low water mark, where the whole public, at common law, have an undoubted right to fish at pleasure, and where no one can claim any exclusive privilege, unless he has acquired it either by grant or prescription. Has then the petitioner a right to be protected in the enjoyment of his weir under the statute? The statute (Gen. Statutes, tit. 23, sec. 2,) enacts " that whoever shall first make a weir for catching fish on any flat within any river, cove, creek, or harbor, shall not be interrupted in the enjoyment of it by any other person making a weir on the same flat, or in the way or course of the fish coming to said weir first built, and nearer than three-quarters of a mile to said weir first built, unless such other person shall have obtained liberty from the superior court." The petitioner claims that the finding shows that he first erected a weir, within the meaning of this statute, on the flats within the harbor of Westbrook; and that the respondents interrupted him in the enjoyment of it, by making another weir on the same flats in the course of the fish coming to his weir, and within three-quarters of a mile of it, and that therefore he is entitled to an injunction against the continuance of the last erection.

The statute on which this claim is founded is an ancient one, passed at a time when, in this country, structures like

the modern fishing pound were unknown. Still, as the structures of the petitioner and the respondents are used for the same purpose as the weirs in use at the time of the passing of the statute, and operate in the same way by leading the fish into an enclosure where they are retained until taken out of it by the fishermen, we are of opinion that they come within the meaning of the statute, and are weirs within any proper definition of the term; so that the question fairly arises whether the respondents' weir was an unlawful interruption of the one previously erected by the petitioner. And as they were both in the same harbor, and within the distance within which a second one cannot lawfully be erected so as to intercept the fish in their course to the first; and as the one last built did in fact to some extent thus interfere with and prevent the fish going to the petitioner's weir, the lawfulness of the last erection must, of course, turn upon whether the petitioner's weir was upon a " flat " within the meaning of the statute.

This word itself is obviously one which may be used in different senses, but in this statute it is confined to some place or places within a river, cove, creek, or harbor where fish may be taken. It implies, therefore, that it must be a place more or less under water. It is frequently used by nautical men to distinguish it from the channel of a river or harbor, and in this sense, while it includes the idea of being under water, it is used as descriptive of a place not navigable with safety by ordinary vessels, on account of the shallowness of the water. And one of the definitions given of it is " a shallow, or shoal water." And we are inclined to think that this is the sense in which it is used in this statute, that is, shallow water as distinguished from deep water, or water navigable with vessels ordinarily used for commercial purposes; and in this sense it appears clear that the petitioner's weir was, at least for the most part, outside of what, under the statute, is to be regarded as a flat. It was not, as we think, the intention of the statute to authorize structures of this sort which might become nuisances by obstructing navigation. But the structure of the petitioner commences at a

point where the water is from four to six feet deep, and extends out into water eighteen feet deep. And being within the limits of the harbor, it is obviously, for the most part, in a place where vessels such as ordinarily navigate the sound would frequently anchor when driven by stress of the weather to a place of safety. It is true that is difficult if not impossible to distinguish between shallow and deep water, and there may be no better rule than to consider all water which is deep enough for the sailing with safety of the smallest class of vessels which are ordinarily used for the purpose of transporting freight, as deep water. If this be the rule it is obvious that nearly the whole of the petitioner's structure is in deep water. But whether this be so or not, we think that water which is deeper than the mouths of many of our harbors and navigable rivers, as much of this is, cannot with any propriety be said to be on a flat within the meaning of this statute.

We are therefore of opinion, and so advise the superior court, that the petitioner's bill should be dismissed.

In this opinion the other judges concurred.