Action to restrain by injunction the defendant from maintaining a nuisance, referred to, have decided all issues of fact and law. The referee, from the evidence, finds the following facts, to wit:
1. Durant's Island is a body of land lying in Dare County, surrounded by the waters of Albemarle Sound, Alligator River, East Lake and the Haulover, and is well known by the name of Durant's Island; all of said waters and land lie wholly within the State of North Carolina.
2. Durant's Island is a swamp or marsh land, except a little around the shore, which is a sand ridge.
3. That on the southern side of the island is a creek or bay making into said island from Albemarle Sound, which creek or bay is known as Tom Mann's Creek.
4. On April 18, 1890, the State Board of Education made and executed a deed unto John E. Reyburn, the plaintiff, which (329) *Page 234 
deed was recorded in Dare County. Said deed describes and the boundaries include Durant's Island.
5. Near the shore of Tom Mann's Creek the plaintiff has erected several houses, which are now, and have been continuously since April 18, 1890, occupied by plaintiff and his servants or agents.
6. The plaintiff has a house known as an ice-house, which is situated over the water of Tom Mann's Creek, which house is connected with the land by a wharf or pier.
7. The plaintiff has cut a canal about ten feet wide and thirty inches deep, which canal connects the waters of Tom Mann's Creek with the waters of Frying Pan, and has built some roads on the island. The said canal was cut prior to the erection of the nets hereinafter referred to.
8. Since 1890 the plaintiff has continuously kept on said island at least two men, who have lived in the houses which were built by plaintiff, and has also kept thereon a stock of cattle and some poultry.
9. In 1890, after the execution of the deed by the State Board of Education, the plaintiff posted notice on Durant's Island forbidding others from trespassing thereon, and has kept others from trespassing upon said island.
10. There is a channel leading from Tom Mann's Creek into Albemarle Sound, which channel, after leaving the creek, turns eastwardly and westwardly nearly parallel with the general curvature of the shore of the island, and running eastwardly until it gets near the northeastern end of the island abreast of the Haulover, where it connects with the deep water of Albemarle Sound, which lies to the northward.
11. From near the mouth of Tom Mann's Creek, going eastwardly to where it connects with the deep waters of Albemarle Sound, (330) this channel is from five to six feet in depth and varies from one hundred and seventy-five to six hundred feet in width. There are shoals in this channel upon which the water is only four feet deep.
12. On the northern or sound side of this channel if a reef or shoal running nearly parallel with the shore or island, which reef or shoals terminates nearly opposite Haulover. This reef or shoal varies in width from thirty to one hundred and fifty feet wide. The water on this shoal or reef is from three to four feet deep, and deeper abreast of Tom Mann's Creek than at other parts, except where the shoal terminates nearly abreast the Haulover.
13. The channel above mentioned extends to the west of the mouth of Tom Mann's Creek. *Page 235 
14. On the southern or shore side of this channel the water gradually shoals until it approaches the shore, but in some places it is as deep as in the channel.
15. The waters on the southern or shore side of the above-mentioned reef are navigable for boats drawing from three to four feet of water. That part of Albemarle Sound on the inside, or shore side of the above-mentioned reef or shoal, is usually and almost entirely navigated and used by boats called shad boats or sprit-sail boats, which boats when loaded draw about thirty inches of water. Boats of smaller size are also used inside of the said reef or shoal, and occasionally boats of larger size, drawing from three to four feet, come inside this reef or shoal. Boats drawing as much or more than seven feet of water can navigate the waters of Albemarle Sound on the outside of the said reef or shoal, and can pass from Albemarle Sound through connecting waters to the Atlantic Ocean.
16. When it is calm, or in moderate weather, boats drawing thirty inches can cross the reef or shoal. In rough weather, and especially when the wind is from the north, northeast or northwest, boats drawing as much as two feet of water cannot cross the reef (331) or shoal with safety, and in such weather boats of smaller size are not safe in Albemarle Sound. When the wind is from the north, northeast, or northwest, this reef has the effect to break the force of the waves beating upon the lee shore, and it is smoother on the inside of the reef than on the outside, and safer for such boats as usually go on the inside than it would be on the outside of the reef.
17. The defendant, prior to the institution of this suit, placed a line of stakes in the waters of Albemarle Sound, which stakes are from two and one-half to four inches in diameter at the water's edge, and larger at the bottom, and extend four or more feet above the water, and are firmly set or driven in the soil under the water. These stakes are nearly abreast of the Haulover and run across the mouth of the above-mentioned channel, and are one hundred and forty feet from its mouth and one hundred and forty feet from the eastern end of the reef, and run parallel with the channel as it empties into the sound, and run nearly at right angles to the reef. The first pocket or pound is from one hundred to one hundred and fifty yards from the reef on the sound side.
18. These stakes for the nets originally began about one hundred yards from the shore, and from that point extended out into the sound a distance of from 1,000 to 1,200 yards. There were two stakes between the shore end of said net stakes and the shore, which two stakes have been removed since this suit began. The stakes starting *Page 236 
from the net stake nearest the shore are placed about sixty feet apart, running out a distance of two hundred to three hundred yards. These stakes are called lead stakes. At about a distance of two hundred to three hundred yards from the shore end of the line of stakes a square thirty-six feet each way is formed by stakes of similar size, the (332) stakes forming this square are about thirty-six feet apart, and have smaller stakes from twelve to eighteen feet apart between them. This forms the pocket of the net. From the outer side of this pocket, another line of lead stakes starts and runs out about two hundred and fifty yards, when another pocket is formed, and this continues until four pockets have been formed. The whole row of stakes extend into the sound about 1,200 yards from the stake nearest the shore.
19. At certain times during the year a net is attached to these lead stakes running from the stakes nearest the shore to the pound stakes; this net is made of net twine, and is hung upon nine-thread manila rope, which is about three-eighths inch in diameter, which manila rope is tied to the lead stake at about the level of the water with marlin. The net drops down in the water. These lead lines sag so as to drop about twelve to eighteen inches below the top of the water in the center between the stakes. This is the usual method of setting Dutch nets.
20. There is attached to the pocket or pound stakes a pocket or pound net made of similar twine, with smaller meshes, tied to similar ropes, which ropes are tied to the pocket or pound stakes with marlin. This pocket or pound of the net is about twenty-eight feet square and is level with the water, and tied to the stakes so as to be kept level with the water and to prevent sagging. About two feet above the pocket another line of rope is tied to the pocket stakes. This line of rope, which is tied to the pocket stakes, is called a hand-line and is about two feet above the level of the water-line. The mouth of the pocket is on the side next to the lead. This is the usual method of setting Dutch nets.
21. When these stakes are broken off and left in the water so that they do not show above it, a boat might run on one of them, and they become more or less dangerous, as they are liable to, or (333) might knock a hole in the bottom or side of a boat.
22. The nets are usually set, in that section, about seven months in the year. The referee is unable to find from evidence when the nets in question were hung upon the stakes, or how long remained, or when taken up. The referee finds that the nets in question were hung to *Page 237 
the stakes, or set, and have been taken up at least once, and have been put down again. The stakes have not been taken up since set.
23. Boats such as are commonly used and such as can be used in navigating the waters of Albemarle Sound when the nets are not set, can with ease and safety pass between the stakes in the lead of the nets, and should one of such boats strike one of the stakes it would not necessarily injure, or delay the boat. If the stakes were rotten or broken off at or below the water's edge, it would be more apt to injure the boat than if it were sound and as originally set.
24. Shad, or sprit-sail boats, and such other boats as usually navigate the waters of that part of Albemarle Sound lying inside of the reef or shoal, can, when the nets are not set, pass between the stakes of the pocket or pound, but not with ease, and these stakes are more apt to injure or delay a boat than the stakes in the lead.
25. When the nets are set, shad or sprit-sail boats or smaller boats, and boats as large as any that usually or can navigate the waters of that part of Albemarle Sound lying south of the reef, can, and generally with safety and without delay or hindrance, pass over the nets of the defendant by going over the lead.
26. When the nets are set boats can pass through the pocket or pound, but are liable to be delayed, obstructed and hindered in their passage.
27. There are times, when the tide is low, the water rough, and the wind blowing hard, that boats, such as are commonly used in that part of Albemarle Sound, cannot cross these nets with ease and (334) safety and might be hindered or delayed by them.
28. There are times when there is but little wind, when, in order to pass over the nets, one would have to push down nets so as to let a boat go over. This can be done with safety, and with but little inconvenience, and without any practical delay.
29. Plaintiff cannot anchor his yacht where nets or stakes are placed, or so near thereto as will permit her to swing on the nets or stakes. There are no special advantages had by anchoring at the place where the nets are situated or so near thereto as to permit the yacht to swing on the stakes. The usual, customary, and best anchorage is in or near the Frying Pan. Occasionally the plaintiff anchors his yacht on the outside of the reef or shoal, which he can still do.
30. The postoffice, from which plaintiff gets his mail while on the island, and from which the servants of plaintiff get their mail, is Mashoes, four miles to the eastward. In going to this postoffice, or going to Manteo, from the island, you will have to cross the nets of the defendant or go around them. *Page 238 
31. In October, 1900 or 1901, Mr. B. G. Crisp, who is the attorney and representative of plaintiff in Dare County, went from Manteo to Durant's Island to see the plaintiff about a matter of business, expecting to return the next day. During the night the wind came on to blow very hard from the northwardly, and continued to blow very hard for two days. The waves were breaking over the reef to such an extent that the boatman who carried Mr. Crisp to the island would not cross the reef. Owing to the rough water on the reef and difficulty in crossing the reef with the breakers on it (335) and the stakes in the channel, the boatmen were afraid to venture out, and Mr. Crisp did not leave for two days. No attempt was made to start.
32. There are eleven stands of nets between Durant's Island and Mashoes, and in going to Mashoes from Durant's Island you cross eleven stands of nets besides the nets of the defendant.
33. None of the boats of the plaintiff, his servants or agents have been delayed or obstructed in any passage which they have undertaken, or have been compelled to change their course, or been damaged on account of the stakes or nets of this defendant, and the plaintiff and his servants or agents have not been prevented from taking any passage on the water on account of the nets of the defendant.
34. The plaintiff has access to his island from the waters of Albemarle Sound through the western end of the channel inside of the reef just to the west of Tom Mann's Creek, also through the channel at the east end of the island. In coming from the postoffice or points east of Durant's Island the plaintiff would have to go around or over the nets; in passing from Tom Mann's Creek to the Haulover the plaintiff would have to cross the nets or go around them.
Upon the foregoing facts the referee finds the following conclusions of law:
(1) That the plaintiff is the owner of Durant's Island. The Code, sec. 2527; Aycock v. R. R. Co., 89 N.C. 321.
(2) That the nets and stakes are a public nuisance.
(3) That as to the plaintiff, neither the nets or the stakes are a private nuisance.
(4) That the plaintiff is not entitled to recover damages for the setting and maintaining said nets, or to have the same abated.
From a judgment for the defendant, the plaintiff appealed.
The referee's conclusions of law upon the (336) facts found by him that the action of the defendant in the placing of pound nets in the manner in which they were set constituted a public nuisance was a correct one. State v. Club, 100 N.C. 477, 6 Am. St. Rep., 618. To prevent a multiplicity of private actions, the law provides a remedy for public nuisances in the way of an indictment, by which the nuisance can be abated or the offender punished by fine or imprisonment, or in both ways. The plaintiff in this action, however, alleges in his complaint that he has suffered, and further that he has shown by the proof that he has suffered, an unusual and special damage on account of the erection of the nuisance by the defendant, and that he therefore is entitled to redress by a civil action, that is, to have the nuisance abated at his own suit. The plaintiff's contention rests upon a sound principle of law, and where the facts go to show that a public nuisance has been the cause of unusual and special damage to an individual or a class of persons, as contradistinguished from a grievance common to the public, that person may bring a civil action for the redress of the injury. In Mfg. Co. v. R. R.,117 N.C. 579, 53 Am. St. Rep., 606, the defendant, by erecting a bridge across a river so low as to obstruct the passage of boats plying up and down the stream, thereby preventing a steamboat from carrying a cargo of merchandise for a consignee up the river and beyond the bridge. The Court held that the defendant was liable in damages for the injury done to the plaintiff, on the ground that the damage was special and unusual to the plaintiff. The Court said there: "It is not material whether this particular boat was licensed, or whether other individuals owned boats that were engaged in navigating the river. If the plaintiff suffered damage common to a class whose business required the transportation of material for manufacturing purposes from a point below the obstruction to a place located (337) above it, but not common to the whole public, his right is not impaired by the fact that the boat was doing business as a common carrier, as well as for the manufacturer who owned it." The same principle was announced in Downs v. High Point, 115 N.C. 182. It is a principle of law found stated in all of the text writers on the subject of nuisance and in the decisions of many of the courts of the states. If the facts be such as the plaintiff claims he has shown them to be in this action, his right to relief by a civil action appears to be clearer in principle and more necessary to the peace and order of society than were the plaintiffs' right in the cases we have cited.
The plaintiff here is the owner of a tract of land (Durant's Island) situated in the midst of navigable waters, and it is necessary to the *Page 240 
full and free enjoyment of his property that his access over the waters to that property and his egress from it should not be obstructed by nuisances erected athwart the channels of approach. The claim of the plaintiff is, that not only was the erection of the fish nets, in the manner in which they were constructed by the defendant, a public nuisance, but that it prevented the free use and enjoyment of his private property, which was a damage and an injury to himself, not in common with the public at large, but as extraordinary and special in its effects upon him. In Blanc v. Plumple, 29 Cal. 156, the Court said: "Undoubtedly if the obstructions only affect the plaintiff in common with the public at large, although in a greater degree, he cannot have his private action; but if he is thereby obstructed in the free use of his property, and its comfortable enjoyment by him is thereby interfered with, and to some extent prevented, can it be said he suffers in common only with the public at large? Anything which is injurious to health, or indecent or offensive to the senses, or (338) an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is declared to be a nuisance and the subject of an action, and it is further provided that such action may be brought by a person whose property is injuriously affected. In Wilder v. DeCon, 26 Minn. 10, the Court decided that the owner of a town lot suffers a peculiar damage by the obstruction of a portion of a public street immediately in front of his lot, and that he might therefore maintain an action to prevent such obstruction, although the same may be a public nuisance. In Rex. v. Dewsnap, 16 East., 196, LordEllenborough said: "I did not expect that it would have been disputed at this day, though a nuisance may be public, yet that there may be a special grievance, arising out of the common cause of injury, which presses more upon particular individuals than upon others not so immediately within the influences of it. In the case of stopping a common highway, which may affect all the subjects, yet if any person sustains a special injury from it he has an action. This must necessarily be a special grievance to those who live within the direct influence of the nuisance and are therefore parties aggrieved within the statute allowing such parties costs." In Wood on Nuisances, pages 886, 887, it is said: "Redress may be had through the medium of a private action in behalf of each person specially injured, although the same damage is inflicted upon many persons at one and the same time, as an obstruction of a highway leading to one's premises, or so as to obstruct access thereto, or otherwise producing special damage; the obstruction of a navigable stream so as to hinder or delay passage over the same, or producing actual *Page 241 
damage to vessels, or by cutting off the approach to a private wharf or premises so as to injure one's premises, is such a special injury as enables the person injured to maintain an action." In Park v.R. R., 43 Iowa 636, a correct syllabus of the decision may be (339) stated as follows: "Injuries resulting from the obstruction of highways leading to the premises of the party complaining and interfering with access to them are proper grounds for recovery by the injured party, and this is so although many others sustain similar injuries from the same cause."
And we are of the opinion that one who suffers damage, through the erection of a public nuisance, unusual and special to himself, is not confined in his remedy to an action merely for damages, especially where the damage arises from an injury and obstruction to the free use and enjoyment of one's property — lands and tenements, as in this case. In 2 Wood on Nuisances, page 1159, the author says: "Any person injuriously affected by a nuisance, who could maintain an action at law therefor, can maintain a bill in equity for an injunction." And Barnes v. Hatthorn, 54 Mo., 127; Thebaut v. Conova, 11 Fla. 143;Peck v. Rider, 3 Sandf. (N. Y.), 126; Danner v. Valentine, 5 Metc., 8, are cited in support of the text. Indeed, in a case like the present, it would be impossible to fix with any degree of certainty the damages which the plaintiff ought to recover for the obstruction of his access to his property; and this Court has said in Jolly v. Brady,127 N.C. 142: "But when the damage cannot be reasonably compensated in a suit at law, or the injury is irreparable, the Court will stay the injury by injunctive order until the parties shall have the main facts determined by a jury." In Wood on Nuisances, page 119, it is said that "When the injury is not susceptible of adequate compensation in damages, or where the injury is a constantly recurring grievance, a court of equity will interpose by injunction." In Works v. R. R., 5 McLean, 525, the Court said: "If such injury exists, no adequate remedy can be found by an action at law. From the nature of the injury its extent cannot be ascertained with precision. It is permanent; consequently the suits at law for redress must be (340) endless. In such case adequate relief can be given only by injunction. It prevents the wrong. To establish this wrong it need not be measured by dollars and cents. It must be shown to exist; it must be material, but the particular amount of damage need not be shown."
But, besides, in this case it appears that if damages could be made a sufficient compensation for the injury done to the plaintiff, a recovery would be of no avail on account of the insolvency of the defendant, *Page 242 
and the injury would therefore be irreparable. In 1 Beach on Injunction, section 34, it is said: "A court of equity in the exercise of its discretion may grant an injunction to prevent a breach or an injury for which there can be no other redress on account of the defendant's insolvency"; and in Kerlin v. West, 4 N.J. Eq., 449, it was declared that an injury may be irreparable, either from its nature or the want of responsibility in the person committing it. 10 Ency. Pl. Pr., page 956.
So far we have considered this case on the theory that the referee had found the facts as the plaintiff insisted they should have been found from the evidence. The referee, however, found as a fact that "none of the boats of the plaintiff, his servants or agents, had been delayed or obstructed in any passage which they have undertaken, or had been compelled to change their course, or been damaged on account of the stakes or nets of this defendant, and the plaintiff and his servants or agents have not been prevented from taking any passage on the water on account of the nets of the defendant." If there had been no other finding of fact by the referee on the subject of the obstruction of the plaintiff's access to his premises, the judgment of the Court below upon the referee's report would have to be affirmed. But there was another finding of fact on that subject and one totally inconsistent with the finding which we have quoted (341) above, which will result in a reversal of the legal conclusion upon those findings. The inconsistent finding of fact referred to is in these words: "In October, 1900 or 1901, B. G. Crisp, who is the attorney and representative of the plaintiff in Dare County, went from Manteo to Durant's Island to see the plaintiff about a matter of business, expecting to return the next day. During the night the wind came on to blow very hard from the northwardly, and continued to blow very hard for two days. The waves were breaking over the reef to such an extent that the boatmen who carried Crisp to the Island would not cross the reef. Owing to the rough water on the reef and the difficulty in crossing the reef with the breakers on it and the stakes in the channel, the boatmen were afraid to venture out, and Crisp did not leave for two days. No attempt was made to start." We are of the opinion that upon that finding of fact the Court should have given judgment that the plaintiff should have his injunction for the abatement of the nuisance.
Error.
DOUGLAS, J., concurs in result only.
Cited: Pedrick v. R. R., 143 N.C. 510; Durham v. Cotton Mills,144 N.C. 711; McManus v. R. R., 150 N.C. 661. *Page 243 
(342)