## W. R. HAMPTON v. NORTH CAROLINA PULP COMPANY.

(Filed 10 November, 1943.)

**1. Judgments § 35—**

The plea of *res judicata* cannot be presented by demurrer, unless the facts supporting it appear on the face of the complaint. It must be taken by answer. C. S., 519 (2).

**2. Judgments § 34: Constitutional Law § 23—**

A judgment of a Federal Court will be given full faith and credit in the State court, when pleaded as *res judicata* according to the practice of the Court; but there is no rule which will compel the State court to accept the law as laid down by any other court, State or Federal, where the subject of the controversy, however similar, is different.

**3. Courts §§ 9, 11—**

Where the jurisdiction of the Federal Court is invoked on the ground of diversity of citizenship, and no federal question is involved, the matters in controversy are determinable by State law.

**4. Waters and Watercourses § 13—**

The Roanoke River, at the place of controversy, is a navigable stream.

**5. Fish and Fisheries § 4: Waters and Watercourses §§ 1, 14—**

A riparian proprietor who owns no part of the bed of navigable waters has no several and exclusive fishery therein.

**6. Same—**

The public has a common right to fish in all navigable waters, provided that right is exercised with due regard for the rights of others.

**7. Fish and Fisheries § 5—**

Owners of several and exclusive fisheries upstream may maintain an action for wrongful interference with the migratory passage of the fish whereby these fisheries are injured.

**8. Fish and Fisheries § 4—**

The necessities of a person whose business is taking fish from a common fishery and one, who by reason of his riparian ownership of the bed of the river, has a several and exclusive fishery are precisely the same, and the same principles of law must apply with respect to the migration of fish.

**9. Nuisances §§ 1, 5, 6—**

The law will not permit a substantial injury to the person or property of another by a nuisance, though public and indictable, to go without individual redress, whether the right of action be referred to the existence of a special damage, or to an invasion of a more particular and more important personal right.

**10. Fish and Fisheries § 5: Nuisance § 3—**

In an action by plaintiff, a riparian proprietor on a navigable river, against defendant, where the complaint alleges that plaintiff is the owner of a long established fishery from the shores of his property along such stream and that plaintiff has suffered damages thereto by the interference of defendant in polluting the waters of the river with toxic chemicals and other matter deleterious to fish life, discharged into said river as waste from defendant's recently established pulp mill, causing a public nuisance and seriously interrupting the migratory passage of fish, it was error for the court below to sustain a demurrer to the complaint as not stating a cause of action.

APPEAL by plaintiff and defendant from *Bone, J.,* at Chambers in Nashville, N. C., 14 July, 1943. From WASHINGTON.

This action was brought by the plaintiff Hampton to recover damages for an injury to his fishery and business on Roanoke River, which it is alleged was brought about by the wrongful act of the defendant through the discharge of deleterious or noxious substances into the river from its pulp plant located below plaintiff's fishery, near the city of Plymouth.

It is. alleged in the complaint that the plaintiff owns certain lands upon the river bank adjacent to the waters of the river, whereupon there has been established a fishery; and that plaintiff and those who preceded him have conducted there a fishery for commercially taking and distributing fish for more than twenty-five years; that during a certain period the defendant operated a plant for the manufacture of bleached and unbleached sulphate pulp, and turned into the waters of Roanoke River opposite its plant a great volume of poisonous, deleterious and objection-

able waste and substances, inimical to the fish inhabiting said waters, to such an extent and in such volume and quantity as to interfere with the free and long established passage, migration and habit of said fish from the ocean on their way to the spawning grounds in the upper reaches of the Roanoke River, and past the properties of the plaintiff, thus to a large extent destroying the fish, and diverting said migratory pilgrimage, so as to seriously damage the business of the plaintiff and the profit from the use of his premises.

The complaint further alleges that an agreement, or contract, was made between the defendant and the North Carolina State Highway Commission, an agent of the State of North Carolina, prior to the erection of the defendant's plant, under which, in consideration of the construction or improvement of a certain road very valuable to the operations of the defendant, and leading to or near the site of its manufacturing plant, defendant would refrain from discharging deleterious or injurious substances from its proposed plant which might destroy or divert the fish, or otherwise interrupt or damage seasonable fishing operations of such persons as might be engaged in fishing, including the plaintiff. That the said agreement was violated, although the road was constructed by the aforesaid agency upon the faith and consideration of defendant's promise.

It is alleged that the discharge of poisonous and deleterious substances from defendant's plant constitutes a wrongful and unlawful trespass and nuisance, destroying the fish inhabiting the waters in front of plaintiff's premises, and greatly damaging the plaintiff and diminishing the usufruct of his property and his fishing business during the period set out, whereby plaintiff was damaged in the sum of $3,000.00.

Plaintiff expressly waives recovery for any sum in excess of $3,000.00 for damages for the designated period, and demands judgment in that amount, and prays for such other and further relief as he may be entitled to receive.

Upon notice, the plaintiff was required to make his complaint more definite by particularizing in certain respects: First, whether the agreement mentioned in the complaint was made orally or in writing; second, that the agreement and documents constituting it be set forth in full; third, in stating at what time the agreement was made; fourth, in stating for what period of time the agreement is claimed to have extended.

In answer to this order the plaintiff amended his complaint in the particulars requested, and appended to the amendment certain communications and documents alleged to have passed between the plaintiff and Honorable Capus M. Waynick, Chairman of the North Carolina Highway Commission, allegedly constituting the agreement referred to.

The defendant then demurred to the complaint upon the following grounds:

The court had no jurisdiction over the subject of the action, inasmuch as an action involving the same subject matter was instituted in this court during the months of March and April, 1941, and was on 7 May, 1941, by order of the clerk of the court, duly removed to the United States District Court for the Eastern District of North Carolina pursuant to the statutes of the United States; and as subsequently thereto, on or about 2 April, 1943, judgment was entered by Honorable I. M. Meekins, Judge for the said United States District Court, dismissing the plaintiff's complaint on the ground that it failed to state a cause of action. The demurrer further points out that as a result of the removal to the United States District Court for the Eastern District of North Carolina, the subject of the action passed from the jurisdiction of the State court into that of the United States District Court, thereby tolling the jurisdiction of the State court; and that, moreover, the judgment of the United States District Court became and is *res judicata* and binding upon the State court.

That it appears on the face of the complaint that there is another action pending between the parties for the same cause; inasmuch as an action involving the same subject matter was instituted as aforesaid in this court during the months of March and April, and was on said 7 May, 1941, duly removed to the United States District Court and the action therein dismissed as aforesaid by an order and judgment of said court entered on 2 April, 1943; and that said United States District Court still has jurisdiction of said action.

That it appears on the face of the complaint, as amended, that the particularized complaint does not state facts sufficient to constitute a cause of action in that:

a. It fails to allege any property right of the plaintiff which was destroyed or injured by defendant.

b. It fails to allege any injury sustained by plaintiff which was not sustained by him in common with all the people of this State.

c. It fails to allege any injury to, or destruction of, any right of plaintiff which was not a right vested in common in all the people of this State.

d. Any alleged contractual rights of plaintiff are based upon a contract which purported to bind the defendant, or its predecessor, to comply with the law of this State, which said contract was therefore without consideration and void.

e. Any contract alleged in said complaint was not made for the benefit of plaintiff, nor was it intended for his benefit.

f. Any contract alleged in said complaint was made by and between the defendant and the State of North Carolina, or an agency thereof, and plaintiff, as an individual citizen of this State, acquired no individual rights thereunder upon which he may sue in this, or any other, court.

g. Any cause of action for the breach of said contract is barred by the statute of limitations.

Treating as a motion in the cause that portion of the demurrer which asks for the dismissal of the action, both for the alleged reason that there is another suit upon the same cause of action pending between the parties in the Federal Court and, further, that the matter in controversy had been settled and become *res judicata* because of a judgment in the Federal Court, the court declined to dismiss the action for either of said causes, inasmuch as the facts relating to them did not appear upon the face of the complaint; but sustained the demurrer to the complaint as not stating a cause of action. From the refusal to dismiss the action for the causes stated, defendant appealed; and from the judgment sustaining the demurrer to the complaint as not stating a cause of action, plaintiff appealed.

*Carl L. Bailey and Ehringhaus & Ehringhaus for plaintiff.*
*Norman & Rodman and J. W. Bailey for defendant.*
*Whyte, Hirschboeck & McKinnon of counsel for defendant.*

### DEFENDANT'S APPEAL.

SEAWELL, J. The appeal of the defendant is from the refusal of the trial judge to dismiss the action for want of jurisdiction, on the ground that another action is pending between the same parties with respect to the same cause of action; and on the ground that the present controversy has become *res judicata* because of a final judgment in the cause in the Federal Court. It is not necessary to point out the contradictory nature of these pleas. While the trial judge, finding the facts, noted that the case in the Federal Court referred to by the defendant was still pending on appeal in that Court, he found, and correctly, we think, that a different subject matter was involved. This is sufficient to dispose of the plea of *res judicata* also. This plea, however, could not be presented by demurrer. Since the facts supporting it, if they exist at all, do not appear upon the face of the complaint, the plea must be taken by answer. *Gibson v. Gordon,* 213 N. C., 666, 197 S. E., 135; *Davis v. Warren,* 208 N. C., 174, 179 S. E., 329; *Thorpe v. Parker,* 199 N. C., 451, 154 S. E., 674; *Smith v. Lumber Co.,* 140 N. C., 375, 377, 53 S. E., 233. The necessity of taking this plea by answer may be referred to C. S., 519 (2), since such a plea necessarily involves new matter consti-

tuting a defense. We would not consider it wise, even if our hands were not stayed, to relax a procedure so definitely tending to prevent confusion. A judgment of a Federal Court upon the identical facts, that is, the identical *res* or subject matter of the action, will be given full faith and credit in the State court when pleaded as *res judicata* according to the practice of the court, no matter how mistaken that court may have been in its interpretation of state law; but there is no rule which will compel the State courts to accept the law as laid down by the Federal Court, or indeed by the courts of this State, as *res judicata* where the subject of the controversy, however similar, is different. The plea rests upon the identity of the controverted facts put at issue and determined by the judgment, and not upon the law applied.

On defendant's appeal, the judgment is
Affirmed.

### PLAINTIFF'S APPEAL.

The plaintiff appealed from the judgment dismissing the case on the ground that the complaint does not state a cause of action. The court below reached its conclusion upon the theory that the plaintiff had not, by reason of the public nuisance complained of, sustained any injury different in kind or degree from that suffered by members of the general public who had the right to fish in Roanoke River.

We think the whole situation may be better understood by a brief reference to the surroundings and conditions under which the controversy arose, and the nature of the industry affected.

The Roanoke, as it flows from Virginia into North Carolina and thence through the Albemarle Sound—no doubt its prehistoric channel—into the Atlantic Ocean, is one of the great rivers of the State, indeed of all our Southern Atlantic Seaboard. Wide terraces in its upper reaches testify to its former vast extent. It is in large part responsible for the sounds and banks through which it now reaches the ocean, as its sediment was deposited through many thousands of years where the slowing current met the tidal wall. No doubt an oceanographic survey would discover its former channel—like that of the Hudson—many miles out at sea, a monument to its greatness when the world was young. Still, in its lower course, it is broad, majestic, and carries down a volume of water which puts an identifying color on most of Albemarle Sound, and suffuses the Neapolitan blue of Edenton Bay with a pale gold.

We are advised in the quaint language of the complaint that the rock, shad, herring, and other fish "infest" the waters of the Roanoke, and except for the unlawful interference of the defendant, might still be taken in commercial quantities by those, including the plaintiff, who

have established fisheries in connection with their premises adjacent to the river.

Every year, under an instinctive urge, these migratory fish enter the river from the salt waters, ascend the stream to its remote upper reaches and tributaries, seeking conditions more suitable for reproduction and preservation of the life of their young, and there cast their spawn. Having performed this duty, they return down the river to other habitats.

The rivers and sounds of North Carolina have not confined their appeal to mere sportsmen; they have been acclaimed as great storehouses of food for the people of the State; and they form a complex of deep and shallow waters which is extremely favorable to the fishing industry, and important fisheries along the river have made that designation one of fact.

There, in times past, have flourished great fisheries of herring and other migratory fish, remarkable for the length of the seines employed and the quantities of fish brought in at a single haul. While production has diminished through the years, partly through the policy of conservation, those fisheries which still persist have a very important place in the food economy of the State and, in that respect, may be said to constitute an essential industry—a business as distinct and universally recognized as merchandising, husbandry, or any other—and sometimes through large adjacent areas more important. Notwithstanding its vicissitudes, the business itself and those engaged in it should have the same protection of the law that is afforded other businesses, as far as its nature and incidents will permit.

If we are to consider such a business as a distinguishing factor, the rights involved in this litigation are not comparable, either in importance or legal effect, with the public right of user belonging to the general citizenry of the State, the violation of which, if invaded at all, is constructive, if not fictional; or, if actual, yet results only in the minor annoyance and inconvenience to which interference with such a right is ordinarily confined.

The main question is whether, considering the nature of his business and the circumstances attending it, the plaintiff may maintain an action to recover damages for the interference with his fishing business by the pollution of the waters of the river with toxic chemicals and other deleterious matter discharged into the river as waste matter from defendant's pulp mill, which arrest the migration of the fish, or divert to other waters their normal run past plaintiff's riparian property.

The Roanoke, at the places mentioned, is a navigable stream. The plaintiff, a riparian proprietor, owns no part of the bed of the stream, and therefore has not a several and exclusive fishery, as that term is known to the law. As in case of other navigable waters, the public has

a common right to fish in all the waters concerned with this controversy, provided that right is exercised with due regard for the rights of others; *Bell v. Smith,* 171 N. C., 116, 87 S. E., 981; *Columbia Salmon Co. v. Berg,* 5 Alaska, 583; *Hampton v. Columbia Canning Co.,* 3 Alaska, 100; *Stannard v. Hubbard,* 34 Conn., 370; 36 C. J. S., Fish, section 8, notes 43, 44; *Hopkins v. R. R.,* 131 N. C., 463, 42 S. E., 902; *Lewis v. Keeling,* 46 N. C., 299; and subject to the superior right of plaintiff as to the area actually occupied, and being fished.

The plaintiff has, however, an established fishing business, which for more than twenty-five years has been carried on in connection with his riparian lands, above defendant's recently established pulp mill, and in convenient access to the migration of fish past the premises. The effluent waste from the pulp mill, taking the complaint to be true, has destroyed or diverted the run of the fish so as to seriously injure or destroy his business and diminish the value of his riparian property, which value was enhanced because of convenient access to the fish and employment of the premises in that connection.

How far in territorial extent the waste from the mill polluted the waters of the river before it became innocuous by diffusion, if it ever did, does not appear. There is no allegation in the complaint that any person other than the plaintiff has suffered any injury from the nuisance, or any suggestion of that kind other than might be remotely inferred from the assumption that the general right of the public to fish in the waters adjacent to plaintiff's premises has been constructively invaded, but with no consequent injury. See *Morris v. Graham, infra.*

The defendant appellant contends that under these conditions plaintiff cannot maintain his present action, since he complains only of injury from a public nuisance, the invasion of a common right; and, upon the face of his complaint, his injury is not different in kind and degree from that suffered by other members of the general public, all of whom have the right to fish in the river.

To the abstract proposition that a person who suffers no special or peculiar damage from a public nuisance cannot maintain an action to recover damages, authorities uniformly agree; *McManus v. R. R.,* 150 N. C., 655, 656, 64 S. E., 766, and cases cited; although there is authority to the effect that a great difference in the degree of injury will take it out of the rule; 46 C. J., Nuisances, section 312. The application of the rule, however, is attended with such difficulty that it is not unusual to find it stated that each case must be decided on its own merits.

As expressing the rule just stated, also as decisive of the present case, the defendant mainly relies on *Dunn v. Stone,* 4 N. C., 241 (1818). Along with the briefs we are provided with the opinion of *Judge Meekins* leading to the decision on the case above mentioned in the United States

District Court. We have no criticism to make of the opinion of *Judge Meekins.* In that case, however, jurisdiction of the Federal Court was invoked because of diversity of citizenship of the parties, and not because any federal question was involved. The matters in controversy were determinable by State law; *Holyoke Water & Power Co. v. Lyman,* 15 Wall (U. S.), 500, 21 L. Ed., 133; and *Judge Meekins* applied the interpretation of State law as he conceived it to be made by the highest Court in the State—in *Dunn v. Stone, supra*—upon the authority of which the defendant relied in that case, and so relies here.

However, we do not think *Dunn v. Stone, supra,* applicable to the situation presented in the case at bar. We construe that case as resting decision on the ground that defendant in building his mill dam across Neuse River was in the exercise of a lawful right, and the consequence to plaintiff's fishery was necessarily *damnum absque injuria.* It reiterates the familiar principle that one cannot be hindered in the exercise of a lawful right merely because it may consequentially affect another in the exercise of his own right. We are not then put to a choice between two rights lawfully exercised—*e.g.,* the right of manufacture, navigation or commerce on the one hand and the right of fishing on the other. *Hardison v. Handle Co.,* 194 N. C., 351, 139 S. E., 614; *Spruill v. Mfg. Co.,* 180 N. C., 69, 103 S. E., 911; *Lewis v. Keeling,* 46 N. C., 299. It is alleged that as proprietor of a long established fishery on Roanoke River, the plaintiff has a right to maintain his fishery, free from unlawful interference with the passage of fish up the river according to their accustomed habit, and that the defendant has wrongfully and unlawfully interfered with this right to plaintiff's injury and damage. *Land Co. v. Hotel,* 132 N. C., 517, 44 S. E., 39. The wrongful interference was accomplished through the violation of State law—C. S., 1968, which was enacted, in part at least, for the protection of the plaintiff and those similarly situated, and was so recognized by the defendant, when, in consideration of the building of roads and a bridge essential to the operation of the plant and further altering the public highway for its convenience, the defendant agreed to conform to these laws and not to pollute the river by discharging into it noxious waste or matter deleterious to fish life. We deal, therefore, not with a conflict of rights, but with the conflict between the right of the plaintiff to the security of an established business and the wrongful conduct of the defendant in interfering with it.

We do not question the general rule that no individual may recover damages because of injury by public nuisance, unless he has received a special damage or unless the creator of the nuisance has thereby invaded some right which, upon principles of justice and public policy, cannot

be considered merged in the general public right; but exclusion of the plaintiff from the courts for such a reason was error.

The real reason on which the rule denying individual recovery of damages is based—and the only one on which the policy it reflects could be justified—is that a purely public right is of such a nature that ordinarily an interference with it produces no appreciable or substantial damage—or, at most, an inconvenience of no serious nature. To deny private redress, the incidence of infraction must be as uniformly public as the right which is exclusively committed to public protection. For instance, interference with a mere right to travel a highway usually entails no appreciable damage, however much the annoyance or inconvenience; but where by reason of a nuisance, however public, substantial injury is inflicted on the health, life, limb or property of the individual it will be found that another sort of right—more intimate, personal and important—has been invaded, for which the sterile satisfaction of public indictment, or abatement of the nuisance will not afford compensation; neither did the law so intend.

The limitation to be put upon the rule under consideration is thus expressed in 46 C. J., Nuisances, sec. 315 (5):

"It has been said that the true limit, within which its operation is allowed, is to be found in the nature of the nuisance which is the subject of complaint, drawing the line, when possible, between the more immediate obstruction or peculiar interference which is ground for special damage and the more remote obstruction or interference which is not, and that, in spite of all the refinements and distinctions which have been made, it is often a mere matter of degree."

In *Wesson v. Washburn Iron Co.,* 13 Allen (Mass.), 95, 103, we have the following:

"The real distinction would seem to be this: that when the wrongful act is of itself a disturbance or obstruction only to the exercise of a common and public right, the sole remedy is by public prosecution, unless special damage is caused to individuals. In such case the act of itself does no wrong to individuals distinct from that done to the whole community. But when the alleged nuisance would constitute a private wrong by injuring property or health, or creating personal inconvenience and annoyance, for which an action might be maintained in favor of a person injured, it is none the less actionable because the wrong is committed in a manner and under circumstances which would render the guilty party liable to indictment for a common nuisance. This, we think, is substantially the conclusion to be derived from a careful examination of the adjudged cases. The apparent conflict between them can be reconciled on the ground that an injury to private property, or to the health and comfort of an individual, is in its nature special and peculiar, and

does not cause a damage which can properly be said to be common or public, however numerous may be the cases of similar damage arising from the same cause." This excerpt from *Wesson v. Washburn Iron Co., supra,* is quoted by *Justice Hoke* with approval in *McManus v. R. R., supra.*

*Swain v. Chicago, etc., R. R. Co.,* 252 Ill., 622, 626, 97 N. E., 247, is in accord with this distinction and expresses the view we have given above as to the nature of a purely public right and accentuates the point that the invasion of such a right is often accompanied by the invasion of a right personal and private, apart from any distinction as to damage in kind and degree ensuing from an interruption or obstruction of the so-called public right:

"The true test seems to be whether the injury complained of is the violation of an individual right or merely a hindrance to the plaintiff in the enjoyment of the public right. It is common usage to speak of one's right to travel upon a public highway or of his right to use a navigable stream, but it seems to us that it is not quite accurate to call a privilege which one enjoys in common with every other person a personal right; but whether the conception be expressed, as it most commonly is, by calling it a right or privilege or liberty—which seems more nearly to express the true legal idea—it is certain that the so-called right of everyone stands upon an exact equality."

To such a right, it is concluded, should the rule excluding individual action for injury be confined.

Making a similar distinction as to a public nuisance the consequences of which are merely confined to invasion of a purely public right and those which also invade other rights which are more personal and indefeasible, it is said in *Harley v. Merrill Brick Co.,* 83 Iowa, 73, 76, 48 N. W., 1000:

"If the health or property of a person be injured from such a cause, he may recover, although the health and property of the general public affected by the nuisance be affected in the same manner. The character of the injury would be the same in each case, but the damages sustained by each individual would be distinct from that suffered by the public, and a recovery therefor would be permitted."

From the well considered case of *Morris v. Graham,* 16 Wash., 343, 47 Pac., 752, relating to the business of fishing in a navigable stream and an obstruction interfering with carrying on the business, we quote:

"(The action) is brought in behalf of a class, and the injury complained of is not common to the general public, but peculiarly affects the respondent, and those in the class to which he belongs. The acts complained of constitute a damage and special injury to him, in which the general public do not share. The fact that others would suffer in the

same way, if they were similarly engaged, constitutes no bar to the maintenance of the present action. As is aptly said by *Mr. Justice Beatty,* in *Mill Co. v. Post,* 50 Fed., 429: 'If what others might suffer under the same circumstances were made the rule, then in no case could it be said individuals ever suffer special damages from a public nuisance.' In *Lansing v. Smith,* 4 Wend., 9, *Chancellor Walworth* says: *'Every individual who receives actual damage from a nuisance may maintain a private suit for his own injury, although there may be many others in the said situation.'* "

The insistence with which we are urged to draw an equation before the law between all injuries sustained from the postulated common right —of the nature and character pointed out—which must in their nature be trivial, strongly suggests an imbalance somewhere in the doctrinal theory or its attempted application. That a man engaged in commercial fishing, wherever prosecuted—having an established trade or business necessary to the public and profitable to himself—may have that industry wiped out and his business utterly destroyed by a series of acts not only wrongful in themselves, but in violation of criminal law, and in such circumstances be denied access to the courts because his injury is no different in kind and degree from that of an angler of the Isaac Walton type, or a denizen of the Great Smoky Mountains who had never heard of the Roanoke River or the fishes that disport themselves therein, or even a person in the common fishery as yet untouched by the nuisance, is a position which the Court would hesitate to take. It brings to point the observation of *Lord Ellenborough* in *Rex v. Dewsnap,* 16 East., 196, quoted in *Reyburn v. Sawyer,* 135 N. C., 328, 47 S. E., 761:

"I did not expect that it would have been disputed at this day, though a nuisance may be public, yet that there may be a special grievance, arising out of the common cause of injury, which presses more upon particular individuals than upon others not so immediately within the influences of it."

Right is an abstract term. It has no satisfactory definition or explanation except in connection with some concrete conception of the thing out of which it grows. It may be a right to do something, to have something, to be something, or even to be let alone. It may refer to a right or privilege to use a highway or other public facility, or to utilize one of the great institutions of nature. But, on the other hand, it may refer to personal liberty, security, health or property. The unquestionably personal and individual rights which pertain to these subjects, wherever invaded by the wrongful acts of another, cannot be disqualified of their significance by crowding them into the general mold of common public rights, for interference with which, since they exist only in a highly

generalized form and point merely to the public convenience, no individual remedy may be had.

Without further entangling the subject in a web of fine distinctions, it all sums up to this: The law will not permit a substantial injury to the person or property of another by a nuisance, though public and indictable, to go without individual redress, whether the right of action be referred to the existence of a special damage, or to an invasion of a more particular and more important personal right. The personal right involved here is the security of an established business. The fact that plaintiff had such established business antedating the nuisance, and that the injury had been done to this, takes him out of the rule and makes his damage special and peculiar. *Reyburn v. Sawyer, supra; Mfg. Co. v. R. R.,* 117 N. C., 579, 23 S. E., 43; *Pedrick v. R. R.,* 143 N. C., 485, 55 S. E., 877; *Viebahn v. Comrs.,* 96 Minn., 276, 104 N. W., 1089.

In the language of *Justice Hoke,* speaking further for the Court in *McManus v. R. R., supra:*

"Where a nuisance has been established, working harm to the rights of an individual citizen, the law of our State is searching and adequate to afford an injured person ample redress, both by remedial and preventive remedies, as will be readily seen by reference to numerous decisions of the Court on the subject."

The Court does not need to be astute in finding such a remedy in the instant case. The plaintiff cannot be denied access to the Court upon the theory that he has suffered no special damage.

Passing such disqualification, the defendant contends that plaintiff has no interest in the migration of the fish such as would give him a right of action for its wrongful interference or diversion, and bases its argument upon the fact that the fish are *ferae naturae* and plaintiff can have no property in them until captured. Plaintiff does not claim any property right in the fish in their wild state; he does claim the right to have the migration continued uninterruptedly to his nets, without the wrongful interference of the defendant. In a different connection, that is, the wrongful interference with the flow of water by an upper riparian owner, *Justice Adams,* in *Smith v. Morganton,* 187 N. C., 801, 802, 123 S. E., 88, thus refers to the permanence of those natural conditions upon which mankind has always depended:

"Furthermore, the right to have a natural water course continue its physical existence upon one's property is as much property as is the right to have the hills and forests remain in place, and while there is no property right in any particular particle of water or in all of them put together, a riparian proprietor has the right of their flow past his lands for ordinary domestic, manufacturing, and other lawful purposes, without injurious or prejudicial interference by an upper proprietor."

It is uniformly recognized that the owners of several and exclusive fisheries upstream may maintain an action for wrongful interference with the migratory passage of the fish whereby these fisheries are injured.

No useful distinction can be made out of the circumstance that these rights are usually asserted by the owners of several and exclusive fisheries. The necessity is precisely the same; that is, that the fish come in to the nets. We are sure that the convenient access which plaintiff had from his riparian property to the run of the fish is an advantage of which he cannot be lawfully deprived by the alleged nuisance. It is true that he might obtain access to the fish by going to more distant points where the nuisance had not yet affected the fish, if there were such places, but "if a man's time and money are worth anything," he has received a substantial damage in being driven to this necessity.

The laws of our own State, and those of practically all the states in the Union where fishing is important, provide against pollution of the streams with matter deleterious to fish life, require channels to be kept open, or means to be provided by which migratory fish may ascend the streams. We do not think this is merely to prevent the common shame of the extinction of an interesting type of river fauna in our time, or for the sole benefit of the owners of exclusive fisheries. In fact, perhaps the largest beneficiaries of these laws are those engaged in the business of fishing in common fisheries. The great fisheries on the Columbia River and of Alaska so conducted are so extensive that their products are found at one time or another on every table in the country. Millions of salmon in the open seas near the mouths of these rivers, seeking through nostalgic instinct the sweeter waters in which they were hatched, have given rise to international difficulties and international treaties.

The necessities of a person whose business is taking fish from a common fishery and one who, by reason of his riparian ownership and ownership of the bed of the river, has a several and exclusive fishery are precisely the same, and the same principle of law must apply.

Hitherto, we have been specially considering the injury to plaintiff's business. He alleges, also, that the value of his riparian property has been diminished. The convenience of access to the fish from his adjacent riparian land, especially in view of the fact that it has been so long used in that connection, may reasonably be considered a contributing element in the value of his premises, and we so hold. Analogous principles of law applied in *Mfg. Co. v. R. R., supra,* and *Pedrick v. R. R., supra,* point to this conclusion. We think it is a conclusion to which we might well come independently.

It has been suggested to us that the complaint asserts no cause of action because it is impossible to connect the nuisance and the injury as cause and effect, and the damages sought must necessarily be speculative

and unprovable. It is pointed out that the business itself is subject to severe vicissitudes and that it would be impossible for the plaintiff to prove that his damage was proximately caused by defendant's misconduct, since there are notoriously a multitude of other causes to which it might be attributed. We could only consider a matter of that kind if it appeared upon the face of the complaint that it would be morally and physically impossible for the plaintiff to adduce evidence in proof of his claim or that the damages asked for are necessarily speculative and incapable of legal proof.

Here, we must revert to the physical facts or we may come to conclusions more *ferae* than the fish. While these are classed as animals wild by nature, their habitat in the river is more restricted than that of any other creature man pursues as food. They are confined to the channels of the river; it is not a question of lure which instinct might avoid, but of the length of the net which is stretched in their way and the size of its meshes, against which instinct cannot avail. They are so defenseless against the devices of man that they would long ago have become extinct, except for their amazing fecundity and their cities of refuge in the great deep—and the laws which, in some degree, protect their migrations. The habit of migration is inherent in their nature and its seasonal recurrence may be expected.

The plaintiff here has complained of injury to a going business, and has not asked for prospective damages beyond its interruption or discontinuance; and there is the legal possibility of his showing such damage without resort to evidence which is wholly speculative in character. *Steffan v. Meiselman, ante,* 154, 25 S. E. (2d), 626.

We have been asked to weigh the economic consequences involved in this decision. The defendant would be in better position upon such an argument—if indeed it could have anything to do with the law of the case—if it had not admitted an agreement with a State Department that it would not permit the discharge of waste matter containing any noxious chemical or matter deleterious to fish life into the river, and if it had not repudiated this agreement as unenforceable, or outlawed by expiration of time.

Also, it may not be improper to question whether defendant might not have alleviated or entirely removed the consequences of its violation of the law and the nuisance thus created by more efficient recovery of the reducing chemicals in the effluent waste, or of the cellulose which is the object of its production; or might have prevented the mischief altogether by lagooning the discharge from the mills so that the deleterious substances might never reach the river in quantities sufficient to be harmful. *Arizona Copper Co. v. Gillespie,* 230 U. S., 46, 57 L. Ed., 1385. These are questions, however, which concern economic balances of cost and

STELL *v.* TRUST CO.

· profit, and the defendant appears, on the face of the complaint, to have made its choice.   The outstanding fact is, taking the complaint to be true, defendant is engaged in a known violation of laws in which the State itself has declared a policy for the conservation of its resources.

We refrain from further discussion of this phase of the case; but it is not amiss to say that a State which deals with its resources on the principle attributed to Louis XIV—*"aprés moi le deluge"*—is headed for economic ruin.

We are constrained to hold that the judgment of the court below sustaining the demurrer was erroneous.   It is therefore reversed.

On defendant's appeal,
Judgment affirmed.

On plaintiff's appeal,
Judgment reversed.